864 A.2d 446

ASBURY PARK PRESS, PLAINTIFF, v. OCEAN COUNTY
PROSECUTOR'S OFFICE, AND THOMAS KELAHER,
DEFENDANTS.

Superior Court of New Jersey
Law Division Ocean County

Decided September 28, 2004.

*Thomas J. Cafferty,* for plaintiff (*McGimpsey & Cafferty,* attorneys).

*Marc E. Roessler,* for defendants (*Ocean County Prosecutor,* attorney).

*Richard D. Pompelio,* for amicus curiae New Jersey Victims of Crime Compensation Board.

*Susan H. Curcio,* for amicus curiae New Jersey Crime Victims' Law Center.

SERPENTELLI, A.J.S.C.

In this Action in Lieu of Prerogative Writs, the Asbury Park Press (hereinafter "Press" or "plaintiff") seeks to compel the Ocean County Prosecutor's Office and Prosecutor Thomas Kelaher (hereinafter, collectively "Prosecutor" or "defendant") to release a copy of a 911 tape and transcript relating to a double homicide which occurred in Dover Township on May 7, 2004. On that date, Josephine O'Brien and Anthony Napolean were shot in their home and during the incident, Napolean called 911 for emergency assistance. Both O'Brien and Napolean subsequently died from

the shootings. O'Brien's son, Peter O'Brien (hereinafter "criminal defendant") is charged with the murders.

On May 14, 2004, the Press requested, pursuant to the Open Public Records Act, *N.J.S.A.* 47:1A–1 to –13 (hereinafter "OPRA" or "Act"), the tape and transcript of the 911 call. The Prosecutor denied the request on May 24, 2004. On June 16, 2004, the Press filed an Order to Show Cause seeking a judgment directing the Prosecutor to release the tape and transcript. A hearing was held on July 2, 2004.

In denying the request, the Prosecutor listed several reasons for withholding the tape and transcript. He stated the release would:

(1) violate the privacy provision set forth in *N.J.S.A.* 47:1A–1;

(2) violate the Victim's Rights Amendment which provides that "a victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system." N.J. Constitution, Article I, Paragraph 22;

(3) violate the Crime Victim's Bill of Rights which provides that a crime victim is "[t]o be treated with dignity and compassion by the criminal justice system". *N.J.S.A.* 52:4B–36a.

The Prosecutor's response said that "[the] request is also denied because the [criminal] defendant 'opposes the release of the 911 tape in any form to the Asbury Park Press.'" The Prosecutor was quoting a letter from Deputy Public Defender Francisco Gonzalez, the attorney for the criminal defendant.

The Press argues that pursuant to OPRA the defendant is obligated to release the 911 tape and transcript since they are both a "government record" as defined in *N.J.S.A.* 47:1A–1.1 and because there is no exemption in OPRA protecting such information. The plaintiff further contends that the reasons for not releasing the tape and transcript are without merit. First, the Press asserts that the "privacy provision" of *N.J.S.A* 47:1A–1 is not substantive law since it is contained within the first section of OPRA, which is entitled "Legislative findings." In the plaintiff's view, that section constitutes a preamble or preface having no directory or binding force of law. A portion of that section states, "a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with

which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy ...." *N.J.S.A.* 47:1A–1. In essence, the Press argues that the first section of the Act contains precatory language merely stating the anticipated goals to be achieved by the mandatory sections that follow it. As such, it does not limit the rights of public access as contained in the balance of the Act. Second, the Press argues that the Victim's Rights Amendment and Crime Victim's Bill of Rights do not apply to this situation because both enactments seek to insure the victim's ability to participate in criminal proceedings and be treated with compassion and respect by the criminal justice system. They were not intended to be a limitation or implied exemption to an OPRA request.

The New Jersey Crime Victims' Law Center and the New Jersey Victims of Crime Compensation Board were granted leave to appear as amici curiae and submit briefs. Both parties reinforce the Prosecutor's position that release of the tape and transcript would violate the New Jersey Constitution under the Victim's Rights Amendment and the Crime Victim's Bill of Rights, *N.J.S.A.* 52:4B–34 to –38.

*Serrano v. South Brunswick Tp.,* 358 *N.J.Super.* 352, 817 *A.*2d 1004 (App.Div.2003), is the leading case discussing the application of OPRA to 911 tapes. However, that opinion specifically makes clear that the decision was not meant to be applied to all 911 tape cases. The court prefaces its analysis with this paragraph:

> We emphasize that our disposition is based on the particular circumstances with which we are confronted, including the characteristics of the 911 call involved in this case, and in particular the caller's express lack of objection to the disclosure. We do not predict what disposition may be appropriate in other cases involving 911 tapes.
>
> [*Id.* at 362, 817 *A.*2d at 1010.]

The facts of *Serrano* are quite distinct from the present case. In *Serrano,* the defendant, Michael Janicki, placed a 911 call at 11:15 p.m., three hours before he allegedly killed his father. At 2:15 a.m., Janicki's mother called 911, as a result of which police officers arrived at the scene and began a criminal investigation. A

reporter made a request to South Brunswick Township for the release of the tape of the first 911 call, in addition to police reports and EMS records, all of which were denied. The case reached the Appellate Division after the prosecutor's office filed an appeal from a decision of the Government Records Council (hereinafter "GRC") directing the prosecutor to allow access to the tape. The Appellate Division affirmed the GRC's decision. *Id.* at 356, 817 *A*.2d at 1006.

The court focused on the issue of whether this 911 tape fit into the "records of investigation in progress" exemption, *N.J.S.A.* 47A:1–3. *Id.* at 366, 817 *A*.2d at 1012. Its analysis of that provision is not relevant to this case since the defendant has not asserted that exemption. Interestingly enough, at the end of its discussion regarding "records of investigation in progress," the Appellate Division felt compelled to mention another portion of OPRA not referenced in the briefs in that case or in the GRC's final decision. The court discussed at length the "expectation of privacy" provision of *N.J.S.A.* 47:1A–1. The *Serrano* court stated:

> With the enactment of OPRA, it is reasonable to anticipate that its declaration of the "public policy" respecting the "citizen's reasonable expectation of privacy" will be considered extensively by the GRC and the courts.
>
> . . . .
>
> In the absence of a privacy claim with respect to the subject 911 tape, we leave for other occasions interpretation of the "citizen's reasonable expectation of privacy" declared in *N.J.S.A.* 47:1A–1. Plainly, the issues presented on such occasions could be complex and challenging, and we recognize that they might entail a consideration and balancing of the interests, not only of those who call 911 or who utilize other police or emergency communications services, but others who are mentioned in or affected by the calls; ... and the extent and nature of the interplay, if any, between the "citizen's reasonable expectation of privacy" and the mandate also set forth in *N.J.S.A.* 47:1A–1, to "construe[ ] in favor of the public's right of access" any limitations in the statute on that right.
>
> [*Id.* at 368–69, 817 *A*.2d at 1014–15.]

Judge Coburn in his concurring opinion explored the privacy issue in greater depth. He emphasized that "in approving publication of the tape here, where there happened to be no objection from the caller, the court is not concluding that all 911 tapes are open to the public under OPRA." *Id.* at 371, 817 *A*.2d at 1016

(Coburn, J.A.D., concurring). He asserted that the OPRA privacy statement is "patterned" after the Kentucky right-to-know statute, which was considered in *Bowling v. Brandenburg*, 37 *S.W.*3d 785 (Ky.Ct.App.2000). That case held that 911 calls were exempt from disclosure under Kentucky's privacy provision. Judge Coburn opined that there is an expectation of privacy in 911 calls and therefore the tapes should be considered confidential under the statute. He said, "[b]ecause of our Legislature's adoption of the language borrowed in large part from the Kentucky statute, it appears to me that both the contents of a 911 call and the caller's identity should be treated by the recipient as confidential under *N.J.S.A.* 47:1A–1." *Serrano, supra,* 358 *N.J.Super.* at 373, 817 *A.*2d at 1017 (Coburn, J.A.D., concurring). Judge Coburn acknowledged that the statutory restriction would not preclude 911 tapes from being released under the common law right to know.

However, neither the majority nor concurring opinions in *Serrano* focused on the fact that the Act's only mention of an expectation of privacy was contained in the "Legislative findings" unlike, as will be discussed, the laws of other states, including Kentucky, which contain explicit mandates concerning privacy expressed as exemptions from the disclosure requirements.

The issue was again alluded to but not decided in *Courier News v. Hunterdon County Prosecutor's Office,* 358 *N.J.Super.* 373, 817 *A.*2d 1017 (App.Div.2003). In that case, a 911 call was made concerning a death that had occurred in the home of the subsequently charged homeowner. The law enforcement authorities immediately concluded that the death was a homicide and seized the 911 tape as evidence in the criminal investigation. The Courier News formally requested a copy of the tape. The court ordered that the tape be released, finding that it was a government record which did not constitute newly discovered evidence and that release did not create an extreme risk of tainting the jury pool. In dicta, however, the court commented on the issue in controversy before this court.

> Our legal analysis is limited to addressing defendant's specific grounds for confidentiality. We do not decide here whether all 911 tapes are open to public inspection under OPRA. We are aware that under *N.J.S.A.* 47:1A–1a [sic] "a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." Here, the 911 caller was Williams' brother. The call was made to summon emergency medical personnel to Williams' home in connection with the shooting of Christofi. No argument has been made in support of confidentiality based on the caller's reasonable expectation of privacy.
>
> [*Id.* at 380 n. 5, 817 *A*.2d at 1021 n. 5.]

Courts of other jurisdictions have confronted the privacy issue more directly. In *New York Times Co. v. City of New York Fire Dep't,* 3 *A.D.*3d 340, 770 *N.Y.S.*2d 324 (2004), the New York Times requested, among other things, the tapes of the 911 calls made to the fire departments concerning the September 11, 2001, attacks on the World Trade Center. The New York Appellate Division held that though the words of the fire department's personnel in the 911 tapes did not fall within the personal privacy exemption of New York's Freedom of Information Law, the words of the 911 callers did. The court stated:

> However, concerning the tapes, the IAS court correctly held that the personal privacy exemption does apply to the words of the callers. Disclosure of the highly personal expressions of persons who were facing imminent death, expressing fear and panic, would be hurtful to a reasonable person of ordinary sensibilities who is a survivor of someone who made a 911 call before dying. The anguish of these relatives, as well as the callers who survived the attack, outweighs the public interest in disclosure of these words, which would shed little light on public issues.
>
> [*Id.* at 327 (citations omitted).]

New York, however, has a specific personal privacy exemption contained in its Freedom of Information Law. *N.Y. Pub. Off. Law* § 87(2)(b). The section requires that all records be made available for public inspection and copying, except if disclosure "would constitute an unwarranted invasion of personal privacy . . . ." *Ibid.*

In Arizona, the state's Public Records Act creates a presumption of access to all public records. *Ariz.Rev.Stat.* § 39–121. There is no personal privacy exemption in the act[1], but the

---

[1] In fact there are only three statutory exemptions from this presumption of access: information identifying peace officers and judges, *Ariz.Rev.Stat.* § 39–

Arizona courts created an exemption by permitting a denial of access when considerations of confidentiality, privacy or best interests of the state outweighs the policy of public disclosure. *A.H. Belo Corp. v. Mesa Police Dep't,* 202 *Ariz.* 184, 42 *P.*3d 615, 617 (2002). In *A.H. Belo,* a babysitter called 911 to report that the baby she was watching fell from his crib. The babysitter was later indicted on charges of child abuse. A television station sent a request for a copy of the transcript and tape of the 911 call. The transcript was provided, but the Mesa Police Department refused to release the tape. The court held that the police department had a substantial basis—the family's privacy interest—in not disclosing the tape.

In Ohio, the state's Public Records Act, *Ohio Rev.Code Ann.* §§ 149.43 to .44, does not have a personal privacy exemption, but does list approximately twenty-four items that are not considered public records. *Ohio Rev.Code Ann.* § 149.43. The state Supreme Court has held that 911 tapes do not fit into any exemption and should be released, regardless of the tape's content. *Cincinnati Enquirer v. Hamilton County,* 75 *Ohio St.*3d 374, 662 *N.E.*2d 334, 337–38 (1996). In a concurring opinion, Justice Pfeifer stated he agreed with the majority, but disagreed with the law.

> I reluctantly agree with the majority's analysis of the law in this case, but I cannot agree with the law. The General Assembly needs to carefully examine whether audiotapes of 911 calls should be subject to public dissemination. Public records laws exist so that government may be open to the scrutiny of the citizenry. To accomplish that goal is it necessary for families to have their most tragic and personal moments broadcast for all to hear? Does a personal tragedy become a public spectacle simply because a person phones the police for aid? Are the media unable to relate effectively the story of a crime or accident without playing a recording of a victim's or a witness's plea for help? Have the rights of victims become subverted by our society's seemingly boundless morbid curiosity, transforming a moment of despair into a Warholian fifteen minutes?
>
> While the quavering voice of a four-year-old pleading with a 911 operator to make daddy stop hitting mommy may be some station manager's idea of "good

123; information identifying archaeological discoveries, *Ariz.Rev.Stat.* § 39–125; and information relating to federal risk assessment to infrastructure, *Ariz.Rev. Stat.* § 39–126.

television," the broadcast of that voice is not the product of good law. I urge the General Assembly to revisit this area.

[*Id.* at 339 (Pfeifer, J., concurring).]

Michigan's Freedom of Information Act does have a personal privacy exemption, but the courts have not interpreted that provision as it relates to 911 calls. *Mich. Comp. Laws* § 15.243(1)(a). In *Payne v. Grand Rapids Police Chief*, 178 *Mich.App.* 193, 443 *N.W.2d* 481 (1989), a 911 tape was held to be a public record not protected by any exemption. *Id.* at 485. However, in that case, it was the caller's parents who requested the tape because they believed foul play was involved in the death of their daughter when the police first ruled it as a suicide and thereafter determined it accidental. *Id.* at 482. The privacy exemption was never claimed because it was the victim's parents who wanted the tape.

Kentucky's Open Records Act, *Ky.Rev.Stat. Ann.* §§ 61.870 to .884, also has a personal privacy exemption for any disclosure which would constitute "a clearly unwarranted invasion of personal privacy." *Ky.Rev.Stat. Ann.* § 61.878(1)(a). In *Bowling v. Brandenburg*, 37 *S.W.3d* 785 (Ky.Ct.App.2001), the Kentucky appellate court ruled that a 911 tape should not be released because the right to privacy of a person in seeking police assistance outweighed substantially the public's right to know. *Id.* at 787–88. In that case, the plaintiff requested the tape of a 911 call alleging that the plaintiff had threatened to kill his wife, the caller, and other family members. *Id.* at 786. The plaintiff claimed he wanted the tape to verify the identity of the caller, alleged to be his grandson, and to be sure that the police had not misunderstood the reported threats that had been made. *Id.* at 788. In denying the request, the court emphasized the need to protect the identity of 911 callers because allowing a caller's identity to become public might discourage individuals from calling 911 to assist others out of fear of "retaliation, harassment, or public ridicule." *Ibid.* It also found that the call "resulted in only a minimal intrusion" upon the plaintiff. *Ibid.*

It should be noted that in most of the cases decided in other jurisdictions the statutory law contained an express provision

relating to privacy that was unmistakably intended as a limitation on or exemption from the right of access. The statutes of other jurisdictions contain similar provisions. *Connecticut General Statute* 1–210(b)(2) states, "[n]othing in the Freedom of Information Act shall be construed to require disclosure of: ... (2) [p]ersonal or medical files and similar files the disclosure of which would constitute an invasion of privacy." To be excluded under the exemption, the person seeking to withhold release of the public record must demonstrate that the record does not pertain to a matter of legitimate public concern and that it is highly offensive to a reasonable person. *First Select Man of Ridgefield Tp. v. Freedom of Info. Comm'n,* 60 *Conn.App.* 64, 758 *A.2d* 429, *cert. denied,* 255 *Conn.* 922, 763 *A.2d* 1041 (2000), *See also Ark.Code. Ann.* § 25–19–105(b)(12) and 5 *Ill. Comp. Stat.* 140/7(1)(b).

■ As noted, the privacy provisions of New Jersey's OPRA are contained in *N.J.S.A.* 47:1A–1. That section reads:

**47:1A–1. Legislative findings**

The Legislature finds and declares it to be the public policy of this State that: government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access accorded by P.L. 1963, c. 73 (C. 47:1A–1 et seq.) as amended and supplemented, shall be construed in favor of the public's right of access;

all government records shall be subject to public access unless exempt from such access by: P.L. 1963, c. 73 (C. 47:1A–1 et seq.) as amended and supplemented; any other statute; resolution of either or both houses of the Legislature; regulation promulgated under the authority of any statute or Executive Order of the Governor; Executive Order of the Governor; Rules of Court; any federal law, federal regulation, or federal order;

a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy; and nothing contained in P.L. 1963, c. 73 (C. 47:1A–1 et seq.), as amended and supplemented, shall be construed as affecting in any way the common law right of access to any record, including but not limited to criminal investigatory records of a law enforcement agency.

As previously discussed, the plaintiff contends that this section is simply a preamble to what is to follow and that nothing in it has the force of law. In support of that argument, the Press points to

the title "Legislative findings" as well as the opening sentence that declares the "public policy" issues addressed by the Act. Further, the plaintiff's brief argues that, with the exception of the language relating to the expectation of privacy as to personal information, every other aspect of Section 1 is specifically embodied in other sections that are the operative provisions of the Act.

The Press asserts the interests identified in Section 1 as goals are the right of prompt access, maintaining in place means to exempt records outside of the Act that existed under prior law, that the common law right to know principles be preserved, and that the citizens' right to privacy be protected. The plaintiff notes that subsequent sections insure prompt access (*N.J.S.A.* 47:1A–5–6), preserve exemptions of certain records without legislation (*N.J.S.A.* 47:1A–9), and maintain the common law right of access (*N.J.S.A.* 47:1A–8). However, the argument continues, nowhere in the Act is there any substantive provision to protect personal information against public access. Furthermore, the procedural sections of the law do not provide for any balancing of the private and public interests as would be required if the statement contained within Section 1 concerning a citizen's expectation of privacy was to be given substantive value.

The defendant's brief does not respond to this analysis. Rather, the Prosecutor relies principally on the language of *Serrano* and *Courier* quoted earlier and specifically notes that *Serrano* refers to *N.J.S.A.* 47:1A–1 as a "mandate." *Serrano, supra,* 358 *N.J.Super.* at 369, 817 *A.*2d at 1015.

Thus, the central issue in this case turns on the court deciphering the legislative intent. That is always a perilous process but some guideposts can be found. As noted, the plaintiff claims that Section 1 of OPRA is a preamble not having any substantive effect. The Press points to the title of Section 1, "Legislative findings" and to the statement of policy contained therein as support for its claim. Generally, it is held that the preamble of a legislative act is not part of the law, and it cannot be used to discern legislative intent if no doubt exists concerning the statute's

meaning. 1A Sutherland, *Statutory Construction* § 20:3 (6th ed. 2002). However, resolution of that issue cannot be determined solely on the basis of labels.

First, it is a well-established canon of statutory construction that "the title of an act cannot support a construction beyond the plain meaning of the body of the statute itself." *Terracciona v. Magee*, 53 *N.J.Super.* 557, 567, 148 *A.2d* 68, 73 (Law Div.1959). The same principle applies to the title of a section of an act. *City of Atlantic City v. County of Atlantic*, 193 *N.J.Super.* 583, 586, 475 *A.2d* 616, 618 (App.Div.1984). Frequently, the title, "like the inscription on a tombstone, serves only to indicate what lies below." *State v. Greene*, 33 *N.J.Super.* 497, 500, 111 *A.2d* 65, 67 (App.Div.1955). Second, the preamble or policy portion of a statute is normally a prefatory explanation or statement preceding the enactment clause. It often contains the word "whereas," and sets forth the reason or occasion for making the law or explains in general terms the policy of the act. *PRB Enterprises, Inc. v. South Brunswick Planning Board*, 105 *N.J.* 1, 5, 518 *A.2d* 1099, 1101 (1987); 1A Sutherland, *Statutory Construction, supra*, § 20:3 and § 20:12. Here, Section 1 does not contain "whereas" clauses or similar words and it follows, not precedes, the enactment clause. While *N.J.S.A.* 47:1A–1 does contain statements of policy, it also sets forth mandates all of which, with the exception of the privacy language, are expressed as separate substantive provisions in other sections of the statute. Third, it should also be noted that our Supreme Court has drawn a distinction between statutory language that is intended as a preamble and provisions intended as a statement of purpose. The Court in *PRB* said:

> In determining the propriety of the Board's actions, and the validity of the Purpose clause on which it relied, we first consider the characterization of the Purpose clause as a preamble . . . .

> Our review of the Purpose clause at issue in this case indicates that its function is different from that of a preamble. Its location in the ordinance is substantially after the enacting clause. Although it generally describes the intended effect of the zoning regulations in the C–1 district, its primary function is to attempt to limit the uses permitted in the district, and to mandate the factors to be considered by the Planning Board in determining whether a use is permitted. In our view, the

Purpose clause was intended to be a part of the body of the ordinance, and should be so construed.

[*PRB Enterprises, Inc.*, *supra*, 105 *N.J.* at 5, 518 *A.*2d at 1101.]

■ Legal formalisms should not be permitted to defeat substance, for it is the actual intent of the Legislature that is the central concern as opposed to the manner in which it has expressed itself. *Smith v. Fireworks by Girone, Inc.*, 180 *N.J.* 199, 216, 850 *A.*2d 456, 466–67 (2004); *Alexander v. New Jersey Power & Light Co.*, 21 *N.J.* 373 378–79, 122 *A.*2d 339, 342–43 (1956). Chief Justice Weintraub has provided the following guidance for those instances in which a literal reading of a body of law appears to contravene clear legislative intent.

It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end "words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms."

[*New Capitol Bar & Grill Corp. v. Div. Of Employment Sec.*, 25 *N.J.* 155, 160, 135 *A.*2d 465, 467 (1957) (citations omitted).]

■ Of course, legislative intent and purpose when clearly expressed must be carried out without reference to rules of construction. *In re Passaic County Utilities Auth.*, 164 *N.J.* 270, 299, 753 *A.*2d 661, 678 (2000). The fact is that legislative intent is, in reality, the sum of individual ideas and opinions of all members of the legislative body. It would be virtually impossible to discover what each legislator thought about every aspect of any bill. Sutherland notes that various methods have been used to accomplish that goal:

Court opinions have sometimes emphasized the words of the legislature themselves as the most reliable source from which to ascertain legislative intent. Others have sought evidence of intent in the "equity of the statute" and when necessary have disregarded statutory language in order to follow legislative intention, and in doing so have said that the court can adopt a position to effect legislative intent to reach an equitable result even though the literal statutory language lends itself to an opposite outcome. Still others have relied on extrinsic evidence found in the legislative history of the prior enactments, the procedure through which the

immediate statute passed, its committee reports, and its interpretation by adminis-
trative officials, in order to determine the intent of the legislature.
[2A Sutherland, *Statutory Construction* § 45:05 at 31–34 (6th ed. 2000).]

█ The court is also enjoined to avoid an untenable outcome in its effort to discover the lawgivers' intent. When one of several options would produce an unreasonable or absurd result, it should be rejected in favor of another that is rational and sensible. *State v. Gill,* 47 *N.J.* 441, 444, 221 *A.*2d 521, 523 (1966) (citing *Robson v. Rodriquez,* 26 *N.J.* 517, 528, 141 *A.*2d 1, 7 (1958)).

With these principles in mind, the court turns to the statute before it. The bill that became OPRA does not contain a comprehensive legislative statement. In an earlier iteration of Senate Bill No. 2003, which was subsequently replaced by Assembly Bill No. 1309 (which in turn ultimately became Chapter 404 of the Laws of 2001), the Senate statement observed:

Section 1: The bill amends N.J.S.A.47:1A–1 to affirmatively state that: the public
has a right of access, with certain exceptions, to all government records; any
limitations on the right of access in the bill will be construed in favor of the public's
right of access .... The legislative findings also recognize the responsibility of a
public agency to protect a citizen's personal information with which it has been
entrusted.

The Senate statement's recognition of privacy issues embodied the concern repeatedly expressed at the March 9, 2000, Senate Judiciary Committee hearing regarding a predecessor bill to the Assembly Bill finally passed. A review of the record of the Senate hearing on the bill that led to the passage of the Act does provide explicit evidence of the legislative concern regarding privacy issues. Some excerpts demonstrate that conclusion:

**Public Hearing before SENATE JUDICIARY COMMITTEE, Senate Bill Nos.
161, 351, 573, and 866. March 9, 2000**
SENATOR ROBERTSON: ... Now the reason that this is important is because
there is a whole host of scenarios that we cannot possibly, in advance, anticipate.
There are going to be requests for information. We passed a bill just last week
that talked about whether a public record should include the addresses of battered
women's shelters. We hadn't anticipated that in advance. Finally, we found out
about it. We put it through the legislative process, and months after it had been
identified, finally there was a law done.

Well, we have a good common law balancing test for those items that might be
unanticipated, and my only concern about a statute that doesn't recognize that

there are different classifications of documents is that we could create a situation where we have inadvertently created an unqualified right to many, many documents that will impact on the legitimate privacy interest of citizens in the state.

I was driving down the Turnpike today and we were talking about this, and as we went through the toll booth we thought, gee, you know, somebody could try to access a document for the E–ZPass billings, if they wanted to track someone's movements. Well, the person is a private citizen, or the person has privacy interests, but the E–ZPass billing documents are, in fact, public documents. Someone else pointed out to me today that, theoretically, those who want to case a house for possible theft can get a list of all the burglar alarms that have been put on file with the local police departments.

There are a whole host of these things, and I'm not saying this in criticism of a bill at all. What I'm saying is that there are going to be a whole host of things that we couldn't possibly anticipate, so what we should be sure to do is to maintain the right of a court to engage in that logical, sensible balancing, and if we abandon that, then I think we will have created something that will have many, many unintended results.

[pp. 9–11.]

. . . .

SENATOR ROBERTSON: Well except, Mr. Chairman, to the extent that courts, when reviewing an application by someone, will have to go according to the law that's in existence at that time. So, while we can fix the law, the fact of the matter is that the person whose rights might accidentally be trampled on will not have that law available to him or to her at the time when they need it.

SENATOR MARTIN: Well, ironically, we're dealing with the same issue from two different perspectives. The reason we leave ours more general is because we don't think we can provide a laundry list of every possible open record. So, therefore, we basically say they'll be open unless government decides, for good public policy reasons, to close it, as opposed to trying to identify areas.

[p. 12.]

. . . .

MR. KEARNS: I don't read that as Senator Martin's bill. Senator Martin's bill says everything is a public record, unless there is an exemption.

SENATOR ROBERTSON: Well, that's what the common law—

MR. KEARNS: No, I don't think that's what the common law says. I think what the common law says is that anything—Right now, we have the statutory, which says if it's mandated, it's public record.

SENATOR ROBERTSON: Right.

MR. KEARNS: The common law says there may be an access to other records. There is a common law right to know, but we have to do a balancing test.

SENATOR ROBERTSON: Right, but the point is that they define records as anything that's kept, essentially.

MR. KEARNS: Correct, but under Senator Martin's bill, they would take everything there, and it would be mandated.

SENATOR ROBERTSON: That's my point.

MR. KEARNS: And that's my concern.

SENATOR ROBERTSON: They're taking the broader language of the common law and putting it in the statutory law.

MR. KEARNS: Yes.

SENATOR ROBERTSON: Isn't the risk that we run, however, thus converting what had been the subject of sensible balancing and making it an absolutely unqualified right—

MR. KEARNS: Yes.

SENATOR ROBERTSON:—that won't—that may not permit a judge to do sensible balancing?

MR. KEARNS: I think that's absolutely true.

SENATOR ROBERTSON: And that's the thing that I'm concerned about, that we're taking away, from the courts, the ability to avoid truly unintended consequences because we have given the statutory imprimatur to everything.

[pp. 31–32.]

. . . .

SENATOR ROBERTSON: I just want to know, will there be a common law balancing act protection for those who may have legitimate privacy rights, not statutory protection, but legitimate balancing test protection that currently exists in the common law.

MR. CAFFERTY: That will continue to exist in the common law in terms of the statute.

[p. 79.]

. . . .

SENATOR ROBERTSON: Absolutely right. And my concern is whether or not a person who has a legitimate privacy right will have his or her interest protected as quickly, or will their only recourse wind up being coming to the Legislature to have an enactment.

[p. 80.]

In addition to the clear awareness of the privacy issue as reflected by these excerpts, it can be presumed that the legislators were well aware of the provisions of *N.J. Const.* art. I, ¶ 22, states:

A victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system. A victim of a crime shall not be denied the right to be present at public judicial proceedings except when, prior to completing testimony as a witness, the victim is properly sequestered in accordance with law or the Rules Governing the Courts of the State of New Jersey. A victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature. For the purposes of this paragraph, "victim of a crime" means: a) a person who has suffered physical or psychological injury or has incurred loss of or damage to personal or real property as a result of a crime or an incident involving another

person operating a motor vehicle while under the influence of drugs or alcohol, and b) the spouse, parent, legal guardian, grandparent, child or sibling of the decedent in the case of a criminal homicide.

[*Ibid.*]

Additionally, even before the passage of the constitutional amendment, the Legislature had sought to provide victim protection by the enactment of the Crime Victim's Bill of Rights. *N.J.S.A.* 52:4B–34 to –49.

Finally, the record before this court reveals that New Jersey Crime Victims' Law Center, an amicus in this action, participated in the legislative process leading to the passage of OPRA, by seeking to impress on the legislators the need to guarantee that the rights of victims would be adequately guarded in any bill that was passed. In short, it is beyond doubt that the lawmakers were well aware of the need to deal with the myriad of privacy issues implicated by an unqualified disclosure of anything that fits the definition of a government record.

 Clearly, the court must always maintain a sharp focus on the purpose of OPRA and resist attempts to limit its scope, absent a clear showing that one of its exemptions or exceptions incorporated in the statute by reference is applicable to the requested disclosure. The salutary goal, simply put, is to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process. *N.J.S.A.* 47:1A–1 to –13; *Nero v. Hyland,* 76 *N.J.* 213, 221, 386 *A.*2d 846, 850–51 (1978). Exposure of records to the light of public scrutiny may perhaps cause discomfort to some. However, OPRA is founded on the premise that society as a whole suffers far more if governmental bodies are permitted to operate in secrecy. As Justice William O. Douglas has said: "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to." *Envtl. Prot. Agency v. Mink,* 410 *U.S.* 73, 105, 93 *S.Ct.* 827, 845, 35 *L.Ed.*2d

119, 142 (1973) (Douglas, J., dissenting) (quoting Henry Steele Commager, *The New York Review of Books,* Oct. 5, 1972, at 7).

■ However, having recognized the overarching value and objective of providing broad access to government records, the court must ask how the release of the dying words of Anthony Napolean in any way contributes to the purpose of OPRA or provides even a scintilla of insight into the functioning of government. Admittedly, the general rule is that one seeking to obtain government records need not explain why they are requested if there is a clear right to obtain them under the statute. *Williams v. Bd. of Educ. of Atlantic City Public Schools,* 329 *N.J.Super.* 308, 314, 747 *A.2d* 809, 812 (App.Div.), *certif. denied,* 165 *N.J.* 488, 758 *A.2d* 648 (2000). Yet, that principle becomes less absolute if there is some protection of a privacy right afforded in the Act. Arguably, the plaintiff may find information of public worth in the manner in which the victim's call was handled. Beyond that, how can the release of the victim's description of his distress and perhaps his last words contribute to the goals of a more informed citizenry or elimination of the evil of secrecy?

The court has had the unpleasant task of hearing the 911 tape in camera, and of reading the transcript of the tape at the same time. It was a chilling, wrenching, lingering experience even for one not related to the victim. The content of the tape would, in the court's judgment, offend and disturb any person of normal sensibilities. It is impossible to imagine what the impact would be on the victim's family and loved ones. It is equally inconceivable that the Legislature would have ever intended that OPRA would have been used as the instrument to put those words, either as spoken or transcribed, in the public domain. Therefore, it is beyond doubt that the victims' survivors would reasonably expect that they would never have to share their loved ones' words with an inquisitive media or curious public.

■ The extensive discussion of privacy concerns in the legislative hearing, the recognition of privacy issues in the Senate statement to an earlier bill, the adoption of OPRA with full

recognition of both the constitutional amendment and statutory protection of victims' rights, the legislators' knowledge that those concerns had always been addressed either by express exemptions or a common law balancing test under the law existing prior to the adoption of OPRA, and the very words chosen in Section 1 of OPRA, convince the court that the Legislature intended to provide protection against disclosure in those instances in which a person had a reasonable expectation of privacy. The fact that the legislation was inarticulately crafted cannot be used as a basis to circumvent the obvious legislative intent—so obvious that our courts in *Serrano* and *Courier News* readily assumed the truth of that proposition.

Therefore, the court finds that the request for the 911 tape was properly denied. As to the transcript, the plaintiff could argue that no violence would be done to the victims' rights by releasing a redacted version eliminating the words of the victim. If that was done, the plaintiff could, at least, assess how the call was handled. As noted, in *New York Times Co. v. City of New York Fire Dep't, supra,* 3 *A.D.*3d 340, 770 *N.Y.S.*2d 324, that procedure was utilized. The decision there gave no indication of the substance of the dispatcher's comments. However, as discussed earlier, this court has read the transcript of the tape. In many instances the 911 dispatcher or the police department personnel repeat either verbatim or in substance the words of the victim. Other comments they make would strongly suggest what the victim is saying or reveal his distress. Therefore, release of even a redacted transcript would intrude on the reasonable expectation of privacy that this court has found is protected by OPRA. Thus, the request to release the transcript must also be denied.