CHIEF JUSTICE RABNER,
dissenting.
This is a case of statutory interpretation. The outcome should depend on the language the Legislature used—or chose not to use—in the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -IS.
OPRA provides the public with access to government records. N.J.S.A. 47:1A-1. Unless an exception in the statute applies, the law affords citizens a broad right of access. Ibid. Relying on the statute, Patricia Gilleran asked the Township of Bloomfield for footage from a video surveillance camera that is visible to the public and focuses on the back of Bloomfield’s Town Hall. The Township denied the request, and this action followed.
The trial court found that OPRA does not create a “blanket exemption” for the disclosure of security tapes and ordered Bloomfield to disclose the footage. The Appellate Division affirmed. It carefully analyzed the language of the statute and agreed that “the statutory exclusions do not provide a blanket OPRA exemption for recordings made from security cameras.” Gilleran v. Twp. of Bloomfield, 440 N.J.Super. 490, 497, 114 A.3d 780 (App. Div. 2015). The panel also found that the Township did *179 not meet its burden to establish that either of OPRA’s two security-related exceptions applies. Id. at 498, 114 A3d 780.
The majority takes a different approach. It concludes that all footage from security cameras is exempt from disclosure under OPRA because the footage would reveal the “capability” and “vulnerabilities” of the government agency’s security system. See ante at 164,176,177,149 A.3d at 803, 810, 811. The majority offers sound reasons why that approach makes sense. But the Court’s decision cannot overcome a fundamental problem: OPRA does not say that all security footage is categorically exempt from public disclosure. The Legislature could have written that standard into the law but did not. Instead, OPRA requires public agencies to disclose government records unless a specific exception applies, and the relevant exceptions do not exempt all security footage from disclosure. According to the language of the statute, the Township must demonstrate that surveillance footage “would jeopardize security” or “would create a risk to” safety to be exempt from disclosure. N.J.S.A 47:1A-1.1. The Township has not made that showing and, therefore, has not met its burden under the law.
Courts must be guided by the Legislature’s policy choices, which appear in the words of the relevant statutes. Because, in my view, the majority has not followed the plain language of OPRA, I respectfully dissent.
I.
The statute provides the critical backdrop to this case. OPRA is designed “to maximize public knowledge about public affairs in order to ensure an informed citizenry.” Mason v. City of Hoboken, 196 N.J. 51, 64, 951 A.2d 1017 (2008) (quoting Asbury Park Press v. Ocean Cty. Prosecutor’s Office, 374 N.J.Super. 312, 329, 864 A 2d 446 (Law Div. 2004)).
At the outset of the law, the Legislature declared that “government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the *180 right of access ... shall be construed in favor of the public’s right of access.” N.J.S.A. 47:1A-1 (emphasis added).
The law’s overall design is straightforward. “[A]ll government records shall be subject to public access unless exempt.” Ibid. OPRA defines “government record[s]” broadly. N.J.S.A. 47:1A-1.1. The law covers “information stored or maintained electronically,” which a political subdivision of the State made or maintained in the course of its official business. Ibid. The statute also exempts certain items from disclosure; the Legislature expressly carved out two dozen areas from the meaning of “government record.” Ibid. OPRA places the burden on public agencies to prove that an exception applies. N.J.S.A. 47:lA-6.
The law also provides various ways for agencies to limit disclosure. For example, as a general rule, before custodians allow access to government records, they must redact social security numbers, credit card numbers, unlisted telephone numbers, or driver license numbers from the records requested. N.J.S.A. 47:lA-5. When part of a record is exempt from disclosure, “the custodian shall delete or excise” that portion and “shall promptly permit access to the remainder of the record.” N.J.S.A. 47:1A-5(g). Also, “[i]f a request for access to a government record would substantially disrupt agency operations, the custodian may deny access to the record after attempting to reach a reasonable solution with the requestor.” Ibid. And if “an extraordinary expenditure of time and effort” is needed “to accommodate” a request, the agency may charge a reasonable “special service charge” based on the actual cost of providing the copies requested. N.J.S.A. 47:lA-5(c); see also N.J.S.A 47:lA-5(d) (allowing reasonable service charges related to information technology).
II.
No party disputes that the surveillance footage sought in this case is a “government record.” The question before the Court is whether any exceptions apply to Ms. Gilleran’s request.
The Township relies on two exceptions in the statute:
*181 emergency or security information or procedures for any buildings or facility which, if disclosed, would .jeopardize security of the building or facility or persons therein; [and]
security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software.
[N.J.S.A. 47:1A-1.1 (emphasis added).]
Neither exception announces a blanket rule that applies to an entire category of information. Yet the Legislature specifically used that approach in other areas. It exempted “criminal investigatory records” from disclosure—without qualification. N.J.S.A 47:1A-1.1. The same is true for “information ... to be kept confidential pursuant to court order.” Ibid. Likewise, “information contained on individual admission applications” to any public institution of higher education is exempt across the board. Ibid.
The Legislature, however, did not exempt all “emergency or security information” or all “security measures and surveillance techniques.” Instead, OPRA excludes from the definition of “government record” only information or footage that, respectively, “would jeopardize security” or “would create a risk to” safety. Ibid.
To satisfy its burden and establish that the above exceptions applied, Bloomfield submitted a certification from its Township Administrator. He explained that “the camera provides security for Town Hall and/or the [adjacent] Law Enforcement Building.” He argued that video surveillance footage should not be disclosed because that “would defeat the entire purpose of having security cameras on Town Hall.” He added that “the public does not know the area that is being surveilled.” In addition, he explained that the safety of police officers, confidential informants, witnesses, domestic violence victims, and members of the public who enter the police station “could be put in jeopardy.” (Emphasis added.)
The general language of the certification does not establish that the safety of any of those individuals would be jeopardized—the standard used in the statute. In fact, because no one has examined the footage in question, the Township cannot represent that any confidential informants, witnesses, or victims appear on the tape. *182 Beyond that, as the Appellate Division noted, the Township did not demonstrate that some feature of the camera would create a risk of harm if the footage were released. See Gilleran, supra, 440 N.J.Super. at 498, 114 A.3d 780. In short, the Township has not met its burden of proof—that disclosure “would jeopardize security” or “would create a risk to” safety—as the law requires.
To be sure, the Township could have availed itself of remedies that OPRA provides. It could have reviewed the surveillance tape and redacted parts that, in fact, “would create a risk to the safety of persons” or “would jeopardize security.” N.J.S.A. 47:1A-1.1. The Township, for example, could have redacted portions that depict any confidential informants. It could have cropped blind spots from the videotape in order not to reveal the system’s limitations. If the Township could demonstrate that the manner and level of review required “would substantially disrupt” the Township’s operations, it could have denied access after first “attempting to reach a reasonable solution with the requestor.” N.J.S.A 47.TA-5(g). In other words, Township officials could have negotiated with Ms. Gilleran about the scope of the request and asked her to narrow it further. At oral argument, counsel for Ms. Gilleran represented that she would have narrowed the request if asked. The Township could have also added a reasonable special service charge if satisfying the request involved “an extraordinary expenditure of time and effort.” N.J.S.A. 47:lA-5(c). But the Township did none of those things. Instead of speaking further with Ms. Gilleran, it simply denied her revised request for one day of video footage.
The majority finds that the release of security camera footage “would reveal information about a system’s operation and also its vulnerabilities.” See ante at 176,149 A3d at 810. According to the majority, such disclosures are “at odds with the legislative intent in creating security exceptions to OPRA.” Id. at 164, 149 A.3d at 803. The majority therefore concludes that footage from security cameras, which presumably reveals sensitive security information, *183 is exempt from disclosure under OPRA. Id. at 164, 175, 177, 149 A.3d at 803, 809, 811.
That may be a sensible approach as a matter of policy. The American Civil Liberties Union of New Jersey, the Reporters Committee for Freedom of the Press, and the media organizations that appear as amici strongly argue otherwise. But what matters in this appeal is what the Legislature said when it made policy choices in the body of the statute. The Legislature did not create a wholesale exception for security footage. Instead, it drafted two security exceptions that each contain two prongs: (1) the material sought must relate to “emergency or security information” or “security measures and surveillance techniques”; and (2) the agency must show that disclosure “would jeopardize security” or “would create a risk to” safety. N.J.S.A. 47:1A-1.1. Unless both prongs are met, the exceptions cannot apply.
The Court, however, effectively exempts security footage from disclosure across the board because of what the footage might reveal about how a security system operates. That standard is quite broad. Indeed, it is hard to see how security footage that covers even a modest amount of time could pass the majority’s test. Beyond that, the Court’s reading of the law gives no meaning to the second prong in both statutory exceptions. The analysis, therefore, runs contrary to a basic rule of statutory interpretation. Courts should give effect to every word of a statute and not read a law in a way that renders language superfluous. See H.S.P. v. J.K., 223 N.J. 196, 207, 121 A.3d 849 (2015); In re N.B., 222 N.J. 87, 101, 117 A.3d 1196 (2015); State v. Regis, 208 N.J. 439, 449, 32 A.3d 1109 (2011).
I would instead address both prongs of OPRA’s security exceptions, as the Appellate Division did. The panel noted that the Township
provided no information ... to indicate that important security strategies or techniques would be disclosed. For example, there was no indication that the security camera might have blind spots in its apparent surveillance areas, or that the clarity and sharpness of the imagery recorded would be revealed in a way that might compromise the strategic deterrent effect of the security camera or overall security system of the building.
[Gilleran, supra, 440 N.J.Super. at 498, 114 A3d 780.]
*184 In my view, the panel correctly found that the Township’s certification contained general statements that “were insufficient to justify withholding the recordings from disclosure.” Ibid.
III.
Security cameras have been around for a long time—well before OPRA was enacted in 2002.[1] Their purpose has always been to protect public safety. Against that backdrop, OPRA placed particular conditions on when security footage could and could not be disclosed; the language of the statute simply did not exempt all footage from disclosure.
The Legislature, of course, is free to rewrite and broaden the security-related exceptions in the law. It can craft a categorical exception for security footage as it has done in other areas. But it is for the Legislature, not the courts, to modify the text of a statute.
When called on to interpret a statute, courts must examine the plain language of the law and give effect to the words the Legislature used. Morristown Assocs. v. Grant Oil Co., 220 N.J. 860, 880, 106 A.3d 1176 (2016); State v. Terry, 218 N.J. 224, 234, 94 A3d 882 (2014). To give sense to the statute as a whole, courts review particular language “in context with related provisions.” Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592, 46 A.3d 1262 (2012) (quoting DiProspero v. Penn, 183 N.J. 477, 492, 874 A2d 1039 (2005)); see also Burnett v. Cty. of Bergen, 198 N.J. 408, 421, 968 A.2d 1151 (2009). Here, the broad exceptions the Legisla *185 ture crafted for other categories of information offer telling context.
. OPRA itself adds another important rule of statutory construction. The law expressly declares that “any limitations on the right of access ... shall be construed in favor of the public’s right of access.” N.J.S.A. 47:1A-1. Reading OPRA’s security exceptions to exempt all security footage heads in the opposite direction.
IV.
The Court remands this matter for further proceedings to assess what information might be available for disclosure under the common law right of access. The majority believes that requests for surveillance videos “are better analyzed under the common law.” See ante at 176,149 A3d at 810.
The common law right of access, while important in its own right, is not a substitute for OPRA. OPRA presumes that records will be released unless an agency can show that they are wholly or partially exempt from disclosure. Under the common law, request-ors have access to a broader array of records but “must make a greater showing than required under OPRA.” Mason v. City of Hoboken, 196 N.J. 51, 67, 951 A.2d 1017 (2008). The common law right of access shifts the burden and requires requestors to “establish an interest in the subject matter of the material.” Ibid. (quoting Keddie v. Rutgers, 148 N.J. 36, 50, 689 A.2d 702 (1997)). That interest “must outweigh the State’s interest in non-disclosure.” Educ. Law Ctr. v. N.J. Dep’t of Educ., 198 N.J. 274, 303, 966 A2d 1054 (2009). Counsel also stressed a more practical difference between the two types of claims. Counsel observed that because attorney’s fees are available to a prevailing party under OPRA, see N.J.S.A. 47:lA-6, but have not been available under the common law, fewer parties will be likely to pursue only common law requests in court.
V.
The Township presented a legitimate legal argument about the scope of two OPRA exceptions, as to which there was little *186 guidance in existing case law. The Township declined to disclose the surveillance footage without first examining what the tape contained. Under the circumstances, I would not order disclosure of the tapes at this time. I would instead remand the case to the trial court and permit the Township to try to satisfy either of the security-related exceptions in OPRA based on what appears on the tape. The Township would then be in a position to redact portions of the tape prior to disclosure, if it could establish that those parts “would jeopardize security” or “would create a risk to” safety. N.J.S.A. 47:1A-1.1.
For those reasons, I respectfully dissent.

 OPRA significantly altered and expanded upon the Right to Know Law, which had been enacted in 1963. Compare L. 1963, c. 73, with L. 2001, c. 404. Both security provisions were added as part of the new law. L. 2001, c. 404, § 1. The Assembly and Senate voted to adopt OPRA in early January 2002; the Governor signed the bill on January 8, 2002. Ibid. Just months before, our nation witnessed the tragic events of September 11, 2001. It is therefore not correct to suggest that the Legislature could not have predicted modern-day security issues and acts of terror when it enacted OPRA. See ante at 173-74, 149 A.3d at 808-09.