962 A.2d 1122 (2009)
404 N.J. Super. 557
Thomas WILSON, Plaintiff-Respondent,
v.
William C. BROWN, Senior Associate Governor's Counsel, in his official capacity as Custodian of Records, Defendant-Appellant, and
Carla Katz, Intervenor-Appellant, and
Communications Workers of America, Local 1034, Intervenor-Respondent.
DOCKET NO. A-5854-07T1, A-5883-07T1
Superior Court of New Jersey, Appellate Division.
Argued November 13, 2008.
Decided January 12, 2009.
*1125 Anne Milgram, Attorney General, argued the cause for appellant William C. Brown (Robert J. Gilson, Assistant Attorney General, of counsel; Megan Lewis, Deputy Attorney General, on the briefs).
Paul J. Fishman, New York, NY, argued the cause for appellant Carla Katz (Friedman Kaplan Seiler & Adelman LLP, attorneys; Mr. Fishman, on the briefs).
Mark D. Sheridan argued the cause for respondent Thomas Wilson (Drinker Biddle & Reath LLP, attorneys; Mr. Sheridan and Heather M. Hughes, Florham Park, on the brief).
David M. Slutsky, New York, NY (Levy Ratner, P.C.) argued the cause for respondent Communications Workers of America, Local 1034 (Mr. Slutsky, attorney and on the joint brief).
Steven P. Weissman argued the cause for amicus curiae Communications Workers of America, AFL-CIO (Weissman & Mintz LLC, attorneys; Mr. Weissman, on the joint brief).
Before Judges CUFF, FISHER and BAXTER.
The opinion of the court was delivered by
*1126 CUFF, P.J.A.D.
In these appeals,[1] we review an order requiring an in camera inspection of electronic mail communications (e-mail) between Governor Jon Corzine and Carla Katz and another order requiring disclosure of all e-mails other than communications concerning issues of general State policy and purely personal communications. We hold that the Governor properly asserted executive privilege and plaintiff did not articulate or identify a sufficient reason to overcome the privilege. Moreover, the interest articulated by plaintiff was insufficient to warrant even an in camera inspection of the documents. Accordingly, the August 21, 2007 order requiring an in camera inspection of the documents and the June 27, 2008 order requiring disclosure of these communications are reversed.

I
On March 27, 2007, plaintiff Thomas Wilson, the Chairman of the New Jersey Republican State Committee, citing the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, requested copies of "any and all documents, correspondence, and/or email communications between the Governor and/or any member of the Governor's staff and ... Katz ... discussing or addressing official State business which were sent to the official State email addresses of the Governor and/or his staff [and] ... to a personal email address of the Governor or any member of his staff." Wilson submitted this request soon after the Governor announced the resolution of negotiations on a new collective negotiations agreement governing State employee members of the Communications Workers of America (CWA).
Before the collective negotiations process began, the Governor stated his commitment to achieve State employee pension and health benefit reforms through the collective negotiations process. From September 20, 2006 to February 21, 2007, the Corzine administration engaged in collective negotiations with representatives of the CWA. Seven CWA Locals represent the State non-uniformed employees. Local 1034, the largest of the CWA Locals, represents approximately 8000 State employees. Katz is the president of this Local. The Governor and Katz had a close personal relationship that ceased before his inauguration. They remained friends, however, and communicated with each other by e-mail and telephone.
At the commencement of the collective negotiations process, the bargaining committee unanimously adopted a resolution barring "ex parte discussions between individual members of the committee and the administration re: bargaining issues." The lead negotiators for the CWA were Christopher Shelton, Area Vice President; Robert Masters, Regional Political Director; and Steven Weissman, counsel. Although not a member of the bargaining team, Katz and other Local presidents played a supporting role during the process. She personally advocated several positions, including resisting a change in the retirement age, opposing increased worker contributions to the pension system and employee contribution for health benefits, and championing worker friendly programs such as flex-time.
On February 21, 2007, the Corzine administration and the CWA reached a tentative agreement that provided for general wage increases but also some benefit concessions. For example, employees would *1127 contribute to the cost of health insurance and contribute an increased amount to their pension. In addition, the retirement age for new employees would increase from fifty-five to sixty years of age.
Approximately four weeks later, Wilson submitted his OPRA request. On April 5, 2007, William Brown, Senior Associate Counsel to the Governor and the designated Custodian of Records for the Office of the Governor, responded that searches undertaken at his direction revealed no documents or correspondence responsive to Wilson's request. He noted, however, that he had discovered e-mail communications responsive to the request but denied Wilson's request to inspect and copy these documents. He asserted "the long-recognized judicial protection afforded non-public communications between senior public officials and those with whom they communicate[,]" and paragraph 2(c) of Governor McGreevey's Executive Order No. 26, 34 N.J.R. 3043(b) (Sept. 3, 2002). Executive Order No. 26 shields from disclosure, pursuant to OPRA, those records of the Office of the Governor that contain "information provided by an identifiable natural person outside the Office of the Governor which contains information that the sender is not required by law to transmit and which would constitute a clearly unwarranted invasion of personal privacy if disclosed." Wilson's request for reconsideration was denied on May 10, 2007.
Meanwhile, at the request of the Governor and a private citizen, the Governor's Advisory Ethics Panel (Advisory Panel)[2] conducted a review of whether the Governor's and Katz's personal contacts during and concerning the collective negotiations created an impermissible conflict of interest under the Governor's Code of Conduct. The Advisory Panel, composed of retired Associate Justice Daniel J. O'Hern and former Attorney General John Farmer, is an advisory, not an investigative, body. The Advisory Panel members interviewed the Governor, Katz, and others, and reviewed the e-mails and other documents relating to the CWA labor negotiations. The Advisory Panel concluded that the close ties between the Governor and Katz did not create an illegal conflict of interest, no appearance of impropriety arose from the Governor's ties with Katz, but the "personal conversations and contacts concerning negotiations were inadvisable."
Three weeks later, Wilson filed a verified complaint and order to show cause against the Governor in which he alleged that the denial of his request to view the communications between the Governor and Katz violated his statutory and common law right to view public documents. Wilson sought access to these communications, attorneys' fees and costs. Katz, individually and as President of Local 1034, filed a motion to intervene, which the trial court granted.[3] In response to the motion to dismiss filed by Brown and Katz, the judge noted that plaintiff was "looking for communications that deal with the government process" rather than personal communications *1128 between the Governor and Katz. He found that the requested communications are government records as defined by OPRA. The judge also held that, in the context of a motion to dismiss, an assertion of privilege cannot be determined without an in camera inspection of the documents. By order dated August 21, 2007, the judge directed Brown to prepare a supplemental affidavit describing his investigation to identify the communications responsive to Wilson's OPRA request, to prepare a privilege log, and to submit all responsive documents for in camera review, except "any documents, emails, or written communications which contain only personal discussions" between the Governor and Katz.
In a written decision dated May 29, 2008, the judge found that the requested documents were government records as defined by OPRA, and the majority of the documents were not exempt from disclosure under OPRA by either Executive Order No. 26 or executive privilege. With regard to the Executive Order, the judge found:
The public has a right to know whether the relationship between the Governor and Ms. Katz had any improper influence or effect on the Governor's paramount obligation to serve the interest of the citizens of New Jersey first. This is the very question which led the Governor and the citizen to request the investigation by the Panel in the first place and the very inquiry undertaken by the Panel. The court finds that the defendant has failed to sustain his burden to establish that the records are exempt from disclosure pursuant to Paragraph 2(c) of Executive Order No. 26.
Addressing executive privilege, the judge held that "[t]here is no question that executive privilege is firmly established in New Jersey." Executive privilege, the judge noted, "has historically been found to attach to communications between the executive and the executive's senior advisors." But that privilege "is limited," and serves to protect only those communications relating to the executive function. The court found that
[t]here can be no debate that the critical position occupied by Ms. Katz in the union hierarchy generally placed her in an adversarial position to the governor and the executive branch, most especially regarding public employee issues. In point of fact, a decision on nearly any issue of state government would have had an impact on at least some of the membership of Ms. Katz's union. The relationship created a clear potential for conflict. The Ethics Advisory Panel recognized the potential for such a conflict in its report, although the Panel did conclude that no actual conflict infected the negotiations or the agreement.
The judge reasoned that the adversarial relationship between Katz's union and the Governor in the collective negotiations process negated any protection afforded by executive privilege to "back channel" communications between the two. The judge stated:
[I]t may well be that Ms. Katz, despite her position in the public employee union, was also an advisor to the Governor. But, any role she may have had as advisor would not serve to protect all her communications with the Governor under the doctrine of executive privilege. Such communications would enjoy only limited protection.... [F]or example, it is clear that any back channel communications between the Governor and Ms. Katz on issues directly affecting public employees not otherwise excluded from disclosure by an exception under OPRA would not be protected by executive privilege. These types of communications would be the sort of communications the Supreme Court felt the public *1129 had the right of access "to understand and evaluate the reasonableness of the public body's action." South Jersey Publishing Co. [v. N.J. Expressway], 124 N.J. [478,] at 494-495 [591 A.2d 921 (1991)].
The judge also addressed Wilson's common law right of access to the requested documents. He found that Wilson had established an interest in the subject matter, and that a balance of the factors weighed in favor of disclosure. He explained that disclosure
would not impede any agency action by discouraging citizens from providing information to the public. The fact will remain that information provided in a proper and lawful manner during recognized collective negotiations will continue to remain protected. In addition, the information communicated by Ms. Katz, the Governor and his representatives during the period of collective negotiations over subjects which were properly the responsibility of the bargaining units was exchanged without any supportable belief that the information would be protected from disclosure to others.... [T]hese persons were on opposite sides of the issues, representing competing interests. There could have been no reasonable expectation by any of these individuals that their communications were protected from disclosure.
In addition, the court rejected Katz's claims that because the documents were prepared "in connection with collective negotiations," as set forth in N.J.S.A. 47:1A-1.1, they were not government records as defined by OPRA. The court found Brown did not claim that Katz had engaged in collective negotiations with the Governor, and that the Governor had denied engaging in such negotiations. Moreover, any communications between the Governor and Katz "would have been outside the authorized bargaining process and would not have been protected by the collective negotiation exception contained in OPRA."
The judge also held that conversations between the Governor and Katz that concerned issues of general statewide policy were protected by executive privilege and not subject to disclosure. However, any communications between the Governor and Katz concerning State employees, their unions or collective negotiations are not protected by executive privilege. Ultimately, the judge protected from disclosure communications that discussed matters of general statewide policy or interest unrelated to the on-going collective negotiations process. He said:
[T]he documents provided to the court are to be released to the plaintiff with the exception of those documents which this court finds are protected by executive privilege. The discussions in these communications relate to topics which do not directly touch upon Ms. Katz's position as president of the union or state employees, but upon issues of general statewide policy. Accepting the assertion that, although an outsider to government, Ms. Katz can still operate as an advisor to the Governor on topics which do not concern state employees, their unions or collective negotiations, this court finds that these communications are subject to protection pursuant to executive privilege.
On June 27, 2008, the judge entered a final order and judgment directing Brown to produce all non-privileged documents within fourteen days of entry of the order, and awarded plaintiff $66,307 in attorneys' fees and costs. This order has been stayed pending appeal.[4]
*1130 Brown appeals from the August 21, 2007 order directing defendant to produce the documents for the court's in camera review, and from the June 27, 2008 final judgment directing defendant to produce documents to plaintiff. Brown and Katz initially argue that the requested documents are not government records and not subject to disclosure under OPRA. N.J.S.A. 47:1A-1.1. Brown, unlike Katz, does not rely on the collective negotiations provision. In fact, Brown argues that the e-mails were not intended to address the collective negotiations process. Instead, he argues that OPRA does not authorize release of the e-mails and attachments because the documents are exempt from disclosure under a recognized privilege, specifically executive privilege. N.J.S.A. 47:1A-9b.
Katz specifically contends that the communications are in connection with collective negotiations and, as such, not considered government records. Katz argues that disclosure of any communications between the Governor and herself are private and not subject to disclosure under either OPRA or the common law. We reject the contention that the communications are not government records but concur that they are protected from disclosure by executive privilege.

II
In enacting OPRA, the Legislature declared that it "shall be construed in favor of the public's right of access" to government records. N.J.S.A. 47:1A-1. The purpose of the statute is "`to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process.'" Mason v. City of Hoboken, 196 N.J. 51, 64, 951 A.2d 1017 (2008) (quoting Asbury Park Press v. Ocean County Prosecutor's Office, 374 N.J.Super. 312, 329, 864 A.2d 446 (Law Div.2004)). OPRA reflects this State's long-standing policy in favor of open access to public records, Serrano v. South Brunswick Township, 358 N.J.Super. 352, 363, 817 A.2d 1004 (App.Div.2003), and recognizes "that society as a whole suffers far more if governmental bodies are permitted to operate in secrecy." Asbury Park Press, supra, 374 N.J.Super. at 329, 864 A.2d 446.
OPRA defines "[g]overnment record" broadly, to include
any paper ... information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer ... of the State ... or that has been received in the course of his or its official business by any such officer.... The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.
[N.J.S.A. 47:1A-1.1.]
In addition to deliberative, consultative or advisory intra-agency or inter-agency material, OPRA identifies twenty-two classes of documents that do not fall within the definition of government record, only one of which is implicated in this appeal. Ibid.
If a document is a government record, it must be disclosed unless it is excluded from disclosure by other statutory provisions or executive orders, N.J.S.A. 47:1A-9a, or exempt from disclosure due to a recognized privilege or grant of confidentiality established in or recognized by the State Constitution, statute, court rule or judicial decision, N.J.S.A. 47:1A-9b. The first inquiry is whether the requested documents meet the statutory definition of government record, and, if so, whether any exemption established in or recognized by *1131 any other law bars disclosure of the requested documents.
Here, the parties do not dispute that the e-mails and attachments were received and sent in the course of the Governor's official business. No one argues that the records of the communications are consultative, advisory or deliberative material between or within agencies. Moreover, the documents do not fall within twenty-one of the twenty-two enumerated classes of documents that are excluded from the definition government record.[5] As such, and contrary to Brown's position, the documents meet the broad definition of government record. The inquiry then shifts to whether the requested records are exempt from disclosure due to a recognized privilege.
Brown and Katz argue that the e-mails and attachments are not subject to disclosure because they are protected by the broad reach of the executive communication privilege, and the court erred in finding that because Katz was an "adversary" of the Governor's office on some issues, their communications were not covered by executive privilege. We agree.
N.J.S.A. 47:1A-9b provides, in part, that the provisions of OPRA "shall not abrogate or erode any executive ... privilege... heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege... may duly be claimed to restrict public access to a public record or government record." The doctrine of executive privilege was recognized by our Supreme Court in Nero v. Hyland, 76 N.J. 213, 225, 386 A.2d 846 (1978). In Nero, the Court addressed a public records request under OPRA's predecessor statute, the Right To Know Act of 1963 (RTKA), N.J.S.A. 47:1A-1 to -4, for a background investigatory report compiled for the Governor about a potential nominee for a State post. Nero, supra, 76 N.J. at 216, 386 A.2d 846. The Court found that the investigations made at the request of the Governor were not public records under the RTKA, but were public records under the broader common law definition. Id. at 220-22, 386 A.2d 846. However, the Court held such public records were not subject to disclosure because they were protected by the doctrine of executive privilege. Id. at 226-27, 386 A.2d 846.
The Court held that the privilege, in the context of New Jersey's governmental structure, "furthers a primary objective of the 1947 Constitutional Convention, namely, the creation of a strong executive." Id. at 226, 386 A.2d 846. "[T]he Governor, as chief executive, must be accorded a qualified power to protect the confidentiality of communications pertaining to the executive function." Id. at 225, 386 A.2d 846. "Confidentiality is vital not only because it serves to protect government sources of information, ... but also because it enhances the effectiveness of investigative techniques and procedures." Ibid. "More importantly, ... executive privilege protects and insulates the sensitive decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security." Id. at 225-26, 386 A.2d 846.
The Court recognized that "[a] vital public interest is clearly involved in the effectiveness of the decision-making and investigatory duties of the executive." Id. at 226, 386 A.2d 846. Thus, recognition of "[a] qualified privilege for communications relating to the executive function promotes the effective discharge of these constitutional duties while ensuring that, in appropriate *1132 circumstances, disclosure of the privileged material will be forthcoming." Ibid.
The Court adopted a balancing test, weighing the interest in disclosure against the public interest in maintaining confidentiality. Ibid. In applying that test, the Court found that "[w]hen the danger of possible unjust censure of a candidate for appointment, especially one who is already a public figure whose character and personal attributes are already the subject of legitimate public interest ... is balanced against the need for effective pre-appointment screening of prospective appointees, the latter interest is far more compelling." Ibid. Disclosure of the information might have a "chilling effect" on the investigative process because it is unlikely that individuals questioned during the background check would be as forthright if their anonymity were not guaranteed. Id. at 224, 386 A.2d 846. The Court held that "the public interest in maintaining confidentiality outweighs plaintiff's interest in disclosure and that no common law right to total access or in camera inspection exists with respect to materials gathered in character investigations of this kind." Id. at 226-27, 386 A.2d 846.
In recognizing executive privilege, the Nero Court drew an analogy to the chief executive communications privilege recognized in United States v. Nixon, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039, 1063-64 (1974). In that case, then-President Nixon filed a motion to quash a subpoena seeking tape recordings of his conversations with aides and advisors for use in criminal prosecutions of government officials linked to the Watergate break-in. Id. at 686, 94 S.Ct. at 3096, 41 L.Ed.2d at 1051. The Court recognized a "presumptive privilege for Presidential communications" that was "rooted in the separation of powers under the Constitution." Id. at 708, 94 S.Ct. at 3107, 41 L.Ed.2d at 1064. The Court acknowledged that the
expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and added to those values the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.
[Id. at 708, 94 S.Ct. at 3107, 41 L.Ed.2d at 1063-64.]
The Supreme Court expressly rejected Nixon's claim of absolute executive privilege, finding that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." Id. at 706, 94 S.Ct. at 3106, 41 L.Ed.2d at 1063. Thus, the Court held that a "presumptive privilege" attached to executive communications, id. at 708, 94 S.Ct. at 3107, 41 L.Ed.2d at 1064, a privilege that could be overcome by a focused demonstration of need, in that case the "specific need for evidence in a pending criminal trial," id. at 713, 94 S.Ct. at 3110, 41 L.Ed.2d at 1067. Notably, the Supreme Court expressly limited its ruling to demands for presidential material relevant to criminal trials. Id. at 712 n. 19, 94 S.Ct. at 3109 n. 19, 41 L.Ed.2d at 1066 n. 19. The Court remanded the matter to the trial court to perform an in camera review of the documents to determine what portions of the tapes should be isolated for *1133 release to the special prosecutor. Id. at 716 n. 21, 94 S.Ct. at 3111 n. 21, 41 L.Ed.2d at 1068 n. 21.
A court faced with a request for access to executive communications that has been met with an assertion of executive privilege must proceed in a manner that respects the foundations of the privilege and the executive's decision to invoke the privilege. Notably, a court does not conduct an in camera inspection of the requested documents unless it determines that the requesting party has demonstrated an adequate need. The Court of Appeals in In re Sealed Case, 121 F.3d 729 (D.C.Cir.1997), explained:
The Nixon cases establish the contours of the presidential communications privilege. The President can invoke the privilege when asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential. If the President does so, the documents become presumptively privileged.[] However, the privilege is qualified, not absolute, and can be overcome by an adequate showing of need. If a court believes that an adequate showing of need has been demonstrated, it should then proceed to review the documents in camera to excise non-relevant material. The remaining relevant material should be released. Further, the President should be given an opportunity to raise more particularized claims of privilege if a court rules that the presidential communications privilege alone is not a sufficient basis on which to withhold the document.
[Id. at 744-45 (footnote omitted).]
Recently in Cheney v. United States District Court, 542 U.S. 367, 380, 124 S.Ct. 2576, 2586, 159 L.Ed.2d 459, 477 (2004), the Supreme Court again addressed the issue of the chief executive communications privilege. In that case, the district court entered discovery orders directing Vice President Cheney to produce information about an energy task force. Id. at 372, 124 S.Ct. at 2582, 159 L.Ed.2d at 472. Petitioners sought a writ of mandamus in the Court of Appeals to vacate the discovery orders. Id. at 376, 124 S.Ct. at 2584, 159 L.Ed.2d at 475. A divided panel of the Court of Appeals dismissed the petition for a writ on the ground that alternate remedies, including the chief executive communications privilege, were available. Ibid.
The Supreme Court ultimately reversed, but in discussing the availability of the executive privilege in the civil context, it applied the Nixon rule as follows:
The need for information for use in civil cases, while far from negligible, does not share the urgency or significance of the criminal subpoena requests in Nixon. As Nixon recognized, the right to production of relevant evidence in civil proceedings does not have the same "constitutional dimensions."
[Id. at 384, 124 S.Ct. at 2589, 159 L.Ed.2d at 480 (citations omitted).]
The Court held that given the extremely broad discovery requests, "Nixon does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line." Id. at 388, 124 S.Ct. at 2591, 159 L.Ed.2d at 482.
Recently in Piniero v. New Jersey Division of State Police, 404 N.J.Super. 194, 961 A.2d 1 (App.Div.2008), this court revisited the executive privilege identified in Nero. The Piniero plaintiffs were State Police Officers who participated in the preparation of a four-way investigation prefatory to the appointment of a former State Police Superintendent. They alleged in their complaint they had been the victims of retaliation for reporting unfavorable information about the prospective Superintendent. Id. at 200-01, 961 A.2d 1. *1134 They sought access to the four-way investigation report submitted to the Governor prior to their depositions. Id. at 200, 961 A.2d 1. Defendants invoked executive privilege and refused to disclose the report. Id. at 200, 961 A.2d 1.
We reversed an order requiring disclosure of redacted portions of the report. In doing so, we rejected the arguments advanced by some of the plaintiffs that the purpose of the privilege could not be advanced by denying their request because they had participated in the preparation of the report and their interest in seeking redress outweighed the interest of the executive branch to preserve the confidentiality of the report. Id. at 211, 961 A.2d 1.
Nero, Piniero, and the federal cases inform us that executive privilege extends to a variety of communications between the chief executive and third parties and that the information exchanged need not be in the nature of formal advice to garner the protection afforded by the privilege. In fact, these cases instruct us that the chief executive should be able to receive a broad range of information from diverse sources to discharge the executive function. A broad executive communications privilege applies to documents in their entirety, covering "final and post-decisional materials as well as pre-deliberative ones." Sealed Case, supra, 121 F.3d at 745. In that regard, although the privilege is based on the need to preserve the executive's "access to candid advice," it does not encompass "only the deliberative or advice portions of documents." Ibid.
Our assessment of the executive privilege asserted in this context must recognize the broad authority bestowed on the chief executive of this State. The Governor of New Jersey is widely considered one of the strongest chief executives in the nation by virtue of the powers assigned to the Office by the State Constitution. N.J. Const., art. V; see Jack M. Sabatino, Assertion and Self-Restraint: The Exercise of Governmental Powers Distributed Under the 1947 New Jersey Constitution, 29 Rutgers L.J. 799, 803 (1998) (recognizing the broad powers granted to the Governor by the 1947 Constitution). In addition to broad appointive authority of executive and judicial personnel, the Governor is required to prepare and submit a balanced budget, negotiate with designated representatives of State employees, and maintain the fiscal integrity of the State. N.J. Const., art. V, § 4, ¶¶ 2-5; N.J. Const. art. VI, § 6, ¶ 1. To that end, the Governor may selectively veto line items in the annual appropriations bill enacted by both houses of the Legislature. N.J. Const. art. V, § 1, ¶ 15. Therefore, it is essential that the Governor have available a broad range of information and the ability to obtain solicited and unsolicited advice. Indeed, the Court held that the executive privilege "insulates the sensitive decisional and consultative responsibilities of the Governor...." Nero, supra, 76 N.J. at 225-26, 386 A.2d 846.
Neither the informal nature of any advice provided by Katz nor her status as an "adversary" in the context of public employee issues can overcome the Governor's interest in confidentiality. Sealed Case, supra, 121 F.3d at 746. Indeed, communications with adversaries can constitute an effective and important part of a Governor's decisionmaking process. Our Supreme Court, in addressing the "official information" privilege, not the executive privilege, wrote that:
there may be timesand they may be the most critical timeswhen a government official will have to make a telephone call that has an arguable claim to confidentialitytimes when, for example, a mayor might need to call a city council member from an opposing political party on a most highly sensitive community issue to enlist that person's support; *1135 or times when a mayor might need to call a community activist to calm troubled waters, without causing disruption that might result from appearing to negotiate with a dissident who may, at the moment, be perceived as a lawbreaker.
[N. Jersey Newspapers Co. v. Passaic County Bd. of Chosen Freeholders, 127 N.J. 9, 17, 601 A.2d 693 (1992).]
Thus, whether the advice is formal or informal or obtained from a person who may be considered an adversary is irrelevant. What is relevant is whether information provided to the executive may enable or enhance the executive's ability to fulfill his constitutional obligations.
Admittedly, the privilege may be overcome as long as the person or entity requesting the documents presents a focused demonstration of need. Nixon, supra, 418 U.S. at 713, 94 S.Ct. at 3110, 41 L.Ed.2d at 1067. Indeed, the Nero Court did not reject the plaintiff's request for documents on the basis that he was a private citizen, but rather on the basis that his interest in disclosure did not outweigh the public's interest in confidentiality. Nero, supra, 76 N.J. at 216-27, 386 A.2d 846; accord, Piniero, supra, 404 N.J.Super. at 211, 961 A.2d 1; see also Loigman v. Kimmelman, 102 N.J. 98, 104, 505 A.2d 958 (1986) (recognizing that the court should balance, in each case, the individual's right to information against the public's interest in confidentiality).
In the context of the executive communications privilege, this balancing of interests must concretely focus on the relative interests of the parties in relation to the specific materials requested. Piniero, supra, 404 N.J.Super. at 206-07, 961 A.2d 1. In the context of the deliberative process privilege, the Court observed that "[a]s with any privilege, the party seeking such documents bears the burden of showing a substantial or compelling need for them." In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 85, 754 A.2d 1177 (2000). In making that determination, the trial court applies a balancing test, weighing the public interest in maintaining confidentiality against a sufficient showing of need for disclosure. Loigman, supra, 102 N.J. at 108, 505 A.2d 958; see Piniero, supra, 404 N.J.Super. at 210-11, 961 A.2d 1 (background investigation not subject to disclosure to officers who contributed to the report); see also Gannett N.J. Partners, LP v. County of Middlesex, 379 N.J.Super. 205, 216-17, 877 A.2d 330 (App. Div.2005) (no disclosure under OPRA of County Administrator's telephone billing records because case law recognized confidentiality of records).
Moreover, this balancing must occur at two stages when the chief executive invokes the privilege. First, a judge must assess whether the requesting party has advanced a sufficient need to warrant an in camera examination of some or all of the documents. Liquidation of Integrity, supra, 165 N.J. at 85, 754 A.2d 1177. Second, if an in camera examination is warranted, a judge must engage in the balancing test again.
Here, Wilson sought disclosure of the e-mails and attachments to determine whether Katz's communications with the Governor and his staff improperly influenced the outcome of the collective negotiations in light of her prior personal relationship with the Governor. In his verified complaint, Wilson simply noted that The New York Times reported that Katz communicated with the Governor by sending one e-mail. Citing the Advisory Panel report, he asserts the Governor and Katz engaged "in numerous written and spoken contacts" since the beginning of the Governor's administration.[6]
*1136 Before the trial court, Wilson stated that his common law interest to obtain access to these communications was to determine "whether the prior personal relationship between the Governor and Ms. Katz influenced the bargaining process." Before this court, Wilson claims disclosure of the e-mails will provide a complete record in order to determine "if the Governor's current/former relationship with Katz affected the Governor in the performance of his duties to the detriment of New Jersey citizens."
A general assertion of a need for full disclosure of the basis for governmental decision making, such as presented here by Wilson, does not establish a specific or focused need sufficient to overcome the executive privilege. Nero, supra, 76 N.J. at 216-27, 386 A.2d 846. Nor does a vaguely defined specter of misconduct. Piniero, supra, 404 N.J.Super. at 208-09, 961 A.2d 1. In Piniero, we rejected requests by those who investigated and reported information on the background of a gubernatorial appointee to inspect the final background report because the need for confidentiality of those providing information and the Governor's need for candid advice outweighed the private interests of the officers. Id. at 211-12, 961 A.2d 1.
Wilson's request for access is based on a general suspicion that something may be amiss. His ill-defined and speculative claim must be balanced against the Governor's interest in protecting the confidentiality of information received from a wide-range of correspondents. Notably, the chief executive "and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." Nixon, supra, 418 U.S. at 708, 94 S.Ct. at 3107, 41 L.Ed.2d at 1064.
Our assessment of the public interest in confidentiality rather than disclosure is assisted by our Supreme Court's discussion of a press request for telephone billing records. Justice O'Hern stated:
We do not believe, however, that the Legislature has yet transposed into the public prism every detail of information that public bodies assemble.... "Stated simply, that public interest is in access to sufficient information to enable the public to understand and evaluate the reasonableness of the public body's action." South Jersey Publishing Co., [supra,] 124 N.J. [at] 494-95 [591 A.2d 921]. Here, almost everything necessary to evaluate the actions of the government official is concededly available: the amount of the telephone bills, the names of the persons who have incurred the bills, and a comparison of the bills with prior expenditures. That information will apprise the public of governmental waste without requiring inferential disclosure of the identity of the neighbor who called to complain of a zoning violation, or the neighbor who had called to report a terrible case of child abuse, or of the community member reputed to oppose *1137 the official who called to make peace.
[N. Jersey Newspapers, supra, 127 N.J. at 18, 601 A.2d 693.]
These observations are strikingly relevant to the circumstances in this case. Here, the Governor and Katz acknowledge that they engaged in communications during the collective negotiations period, that some of those communications included discussion of public issues other than those that were part of the collective negotiations, but the remaining communications concerned the collective negotiations. Both parties admit that they were counseled not to engage in any "back channel" conversations but did so, and that at some point before the negotiations process ended, all communications ceased. Wilson and the public also know the Governor's stated goals for the collective negotiations process and the results that followed. In short, Wilson and the public have already obtained almost everything necessary to evaluate the actions of the Governor.
Stripped to its basic terms, Wilson has articulated no more than a suspicion of conduct that may reveal flawed judgment but does not implicate criminal misconduct. His articulated need is hardly the focused need that warrants either an in camera inspection or disclosure of the identified communications.

III
Having concluded that OPRA does not require disclosure of the e-mails because the documents are protected by executive privilege and plaintiff has not asserted an interest of sufficient weight to overcome the privilege, we must still determine whether the documents are subject to disclosure under the common law right of access to government documents. Defendant and Katz argue that the trial court erred when it failed to hold that executive privilege may override the common law right. We agree.
N.J.S.A. 47:1A-8 provides that nothing contained in OPRA "shall be construed as limiting the common law right of access to a government record." "The common law definition of a public record is broader than the definition contained in OPRA." Mason, supra, 196 N.J. at 67, 951 A.2d 1017. Public records available for inspection under the common law include any records made by public officers in the exercise of their functions. Fine v. Rutgers, 163 N.J. 464, 468-69, 750 A.2d 68 (2000); Keddie v. Rutgers, 148 N.J. 36, 49, 689 A.2d 702 (1997); Home News v. Dep't of Health, 144 N.J. 446, 453, 677 A.2d 195 (1996); Higg-A-Rella, Inc. v. County of Essex, 141 N.J. 35, 46, 660 A.2d 1163 (1995); Nero, supra, 76 N.J. at 221-22, 386 A.2d 846. Under this broad definition, the e-mails and attachments are common law public records.
However, "[t]o access this broader class of documents, requestors must make a greater showing than required under OPRA...." Mason, supra, 196 N.J. at 67, 951 A.2d 1017. First, the person seeking access to the documents must establish an interest in the subject matter of the material. Ibid. Second, the court must balance the person's interest in obtaining access against the State's interest in preventing disclosure. Id. at 67-68, 951 A.2d 1017; Higg-A-Rella, supra, 141 N.J. at 46, 660 A.2d 1163; S. Jersey Publ'g, supra, 124 N.J. at 488, 591 A.2d 921. Thus, Wilson must make a showing of need sufficient to outweigh the public's interest in preventing disclosure of documents protected by executive privilege. Higg-A-Rella, supra, 141 N.J. at 47-48, 660 A.2d 1163.
In applying the first factor, the trial court correctly found that "[t]he party's interest in the subject matter of the *1138 document need not be a personal interest." See Home News, supra, 144 N.J. at 454, 677 A.2d 195 (press and citizen concerns about public problem presented a sufficient interest); Educ. Law Ctr. ex rel. Burke v. N.J. Dep't of Educ., 396 N.J.Super. 634, 643, 935 A.2d 858 (App.Div.2007) (concerns for integrity of disbursement of public funds sufficient). However, the court did not address this prong in light of defendant's assertion of executive privilege. "Where a claim of confidentiality is asserted, the applicant's interest in disclosure is more closely scrutinized." Keddie, supra, 148 N.J. at 51, 689 A.2d 702; see N. Jersey Media Group Inc. v. State, Dep't of Personnel, 389 N.J.Super. 527, 538-39, 913 A.2d 853 (Law Div.2006) (applying Keddie).
Unquestionably, "more than a showing of good faith and citizen status will be required to overcome the public interest in confidentiality." Loigman, supra, 102 N.J. at 108, 505 A.2d 958. It is not sufficient to assert a generalized suspicion of corruption. Ibid. Where the inquiry relates to disclosure of privileged records, the party seeking disclosure must show a "particularized need that outweighs the public interest in confidentiality of the investigative proceeding." McClain v. Coll. Hosp., 99 N.J. 346, 351, 492 A.2d 991 (1985); accord Paff v. Dir., Office of Attorney Ethics, 399 N.J.Super. 632, 649, 945 A.2d 149 (Law Div.2007).
Courts have developed a three-part test to assess whether a party has articulated a sufficiently compelling particularized need: (1) the extent to which the information may be available from other sources; (2) the degree of harm that the litigant will suffer from its unavailability; and (3) the possible prejudice to the agency's investigation. McClain, supra, 99 N.J. at 351, 492 A.2d 991.
Here, the exact content of the e-mails are not available from other sources. However, the privilege log, the parties' concessions, and the Advisory Panel conclusions shed considerable light on the nature and extent of the communications. By contrast, Wilson cannot show he will incur any harm if the e-mails are not disclosed. The public can measure what, if any, influence the relationship between the Governor and Katz, and any communications between them during the collective negotiations process, may have had against the Governor's stated goals at the commencement of the negotiations process and the final result. Whatever interest Wilson has in making this information public is speculative, and greatly diminished. Additionally, the release of confidential e-mails may have a chilling effect on the Governor's ability or willingness to solicit advice, or to accept unsolicited advice in the future.
Even if Wilson established a sufficient interest in the subject matter of the material, we must determine whether Wilson's expressed interest outweighs our chief executive's interest in confidentiality. Mason, supra, 196 N.J. at 67-68, 951 A.2d 1017; Shuttleworth v. City of Camden, 258 N.J.Super. 573, 584, 610 A.2d 903 (App. Div.), certif. denied, 133 N.J. 429, 627 A.2d 1135 (1992). The balancing test is "flexible and adaptable to different circumstances and sensitive to the fact that the requirements of confidentiality are greater in some situations than in others." McClain, supra, 99 N.J. at 362, 492 A.2d 991. "As the considerations justifying confidentiality become less relevant, a party asserting a need for the materials will have a lesser burden in showing justification." Ibid.
Factors to consider in applying the balancing test include:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure *1139 may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
[Loigman, supra, 102 N.J. at 113, 505 A.2d 958.]
Here, the trial judge found that none of the interests applied. We disagree.
Several factors weigh heavily in favor of non-disclosure. The Governor is responsible for making a vast array of decisions, and "must be accorded a qualified power to protect the confidentiality of communications pertaining to the executive function." Nero, supra, 76 N.J. at 225, 386 A.2d 846. Confidentiality serves to protect government sources of information, and disclosure of confidential e-mails between the Governor and a union leader, or a union leader and members of the Governor's staff, would tend to have a "chilling effect." Balancing the competing interests, Wilson's limited interest in obtaining the documents pales against the public's strong need for confidentiality essential to the Governor's responsibilities.
Due to this disposition, we need not determine whether the request was overly broad or whether the communications between the Governor and Katz can be considered information obtained in connection with collective negotiations and, hence, not government records.
Reversed.
NOTES
[1] Defendant William Brown and intervenor Carla Katz filed separate appeals that were calendared back-to-back. We have consolidated these appeals to render a single opinion.
[2] Governor Corzine created the Advisory Ethics Panel on January 17, 2006. Exec. Order No. 1, 38 N.J.R. 1110(c) (Feb. 21, 2006). It is composed of two public members appointed by the Governor in consultation with the Chair of the Ethics Commission. Id. at 1114. The Advisory Panel is available to advise the Governor regarding conflict of interest issues, application of the Governor's Code of Conduct, and related matters. Ibid. The Governor shall seek advice from the Advisory Panel when questions arise concerning the propriety of the Governor's conduct under the Code. Ibid. If an inquiry is submitted to the Advisory Panel after the fact, the Advisory Panel may review the question and issue a public determination. Ibid.
[3] By order dated August 3, 2007, William C. Brown, the designated Custodian of Records for the Office of the Governor, was substituted as defendant in place of Corzine.
[4] On May 30, 2008, the trial judge denied defendant's motion to redact that portion of the court's decision referencing the Bates numbers of the e-mails and attachments. On that same date, this court denied defendant's application for a stay of that order.
[5] Katz asserts that the documents fall within the "information generated ... in connection with collective negotiations" exclusion. N.J.S.A. 47:1A-1.1. Due to our disposition of the applicability of executive privilege, we need not address that position.
[6] The Verified Complaint reads as follows:

5. On information and belief, Ms. Katz engaged in numerous written and spoken communications with Defendant since Defendant became the Governor of New Jersey. According to the Report of the Ethics Advisory Panel Appointed by Governor Corzine's Executive Order No. 1 (The "Report,") there were multiple communications between Ms. Katz and Defendant and members of his staff, including e-mails, in 2006 and 2007. A true and exact copy of the Report is attached hereto as Exhibit A....
6. On information and belief, as reported in The New York Times on May 23, 2007, Ms. Katz communicated directly with Defendant by sending Defendant at least one e-mail to his "private e-mail address" in 2006.