9 A.3d 1064 (2010)
417 N.J. Super. 341
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO; and New Jersey Education Association, Plaintiffs-Appellants,
v.
David ROUSSEAU,[1] Treasurer of New Jersey; the State of New Jersey, Department of the Treasury; and Barbara O'Hare, Manager of the Government Records Access Unit, Defendants-Respondents, and
Blackstone Capital Partners V, L.P., BCP V-S, L.P.; Oak Hill Capital Partners, II, L.P.; Quadrangle Capital Partners IL, L.P.; and Warburg Pincus IX, LLC, Intervenors-Respondents.
Docket No. A-4194-07T3.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 2009.
Decided December 17, 2010.
*1066 Annmarie Pinarski, Somerset, argued the cause for appellant Communications Workers of America, AFL-CIO (Weissman & Mintz, LLC, attorneys; Ms. Pinarski, on the joint brief).
Keith Waldman, Mount Laurel, argued the cause for appellant New Jersey Education Association (Selikoff & Cohen, PA, attorneys; Carol H. Alling, on the joint brief).
Julian F. Gorelli, Senior Deputy Attorney General, argued the cause for respondents (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Gorelli, and Rubin D. Weiner, Deputy Attorney General, on the brief).
James M. Hirschhorn, Newark, argued the cause for intervenors-respondents (Sills Cummis & Gross, attorneys; Mr. Hirschhorn, on the brief).
*1067 Before Judges CUFF, PAYNE, and C.L. MINIMAN.
The opinion of the court was delivered by
CUFF, P.J.A.D.
Plaintiffs Communications Workers of America, AFL-CIO (CWA) and the New Jersey Education Association (NJEA) filed this action under the Open Public Records Act, N.J.S.A. 47:1A-1 to -13 (OPRA), and common law right of access to public records against the Department of the Treasury, the State Treasurer, and Barbara O'Hare, Manager of Government Records Access Unit. Plaintiffs seek to inspect all agreements relating to investments made by the Division of Investment in private equity funds with money from state-employee pension funds. They assert that these records have been wrongfully withheld from them and seek their production. The trial judge held that the agreements were confidential and not subject to disclosure either under the statutory or common law. We agree and affirm.

I
In 2005, the Securities Investment Council (SIC),[2] the Department of the Treasury agency that establishes policy and procedures for the investment of state-employee pension funds, adopted an alternative investment program (AIP) to expand the types of investments the Director of the Division of Investment (Director) could make with money from state-employee pension funds. To implement the AIP, the SIC adopted regulations (1) creating a common trust fund known as Fund E in which money from CWA and NJEA pension funds could participate for the purpose of investing in alternative investments, N.J.A.C. 17:16-69.1 to -69.10; and (2) authorizing investment in private equity funds, N.J.A.C. 17:16-90.1 to -90.4.
The AIP was controversial. Although designed to provide additional means to enhance returns on pension fund investments, some feared the alternative investments exposed the funds to greater risk and possible conflicts of interest. CWA and NJEA challenged the SIC regulations authorizing investment in private equity funds and another set of regulations authorizing the Director to engage external investment managers to manage pension fund investments. In Communications Workers of America v. Rousseau, Nos. A-5198-04T1, A-5378-04T1, A-6126-04T1, 2008 WL 3876032 (App.Div. Aug. 22, 2008) (slip op. at 36), we invalidated the regulations authorizing and engaging external investment managers. We also held the SIC had authority to adopt regulations that allowed investment in private equity funds and the Director could invest in private equity subject to the standard of care set forth in N.J.S.A. 52:18A-89b. Ibid.
In June 2005, plaintiffs submitted to the State Treasurer separate but identical requests for documents relating to investments in private equity funds with money from the state-employee pension fund. In October 2005, O'Hare identified thirteen documents responsive to plaintiffs' request. These documents include the following:
1. Oak Hill Amended and Restated Agreement of Limited Partnership.
2. Quadrangle Amended and Restated Limited Partnership Agreement.
3. Warburg Pincus Amended and Restated Agreement of Limited Partnership.
4. Oak Hill Letter Agreement.
5. Oak Hill Subscription Booklet.

*1068 6. Warburg Pincus Investor Questionnaire and Representations.
7. Warburg Pincus Letter Agreement.
8. Quadrangle Letter Agreement.
9. Quadrangle Subscription Documents.
10. Blackstone Subscription Agreement and Investor Questionnaire.
11. Blackstone V Amended and Restated Agreement of Limited Partnership.
12. Blackstone V-S Amended and Restated Agreement of Limited Partnership.
13. Blackstone Letter Agreement.
O'Hare denied access to most of the documents (items one through four, seven, eight, and eleven through thirteen) citing several reasons. She explained that the documents contained trade secrets and proprietary commercial or financial information, competitors would receive an unfair competitive advantage, and the State's interest in nondisclosure outweighed plaintiffs' interest in accessing the documents. The remaining documents were provided to plaintiffs in redacted form.
Plaintiffs filed their complaint in the Law Division seeking production of the withheld documents on December 5, 2005. In their January 2006 answer, defendants denied that the documents were subject to production. The private equity funds, Blackstone Capital Partners V, L.P. and BCP V-S, L.P. (Blackstone), Oak Hill Capital Partners, II, L.P. (Oak Hill), Quadrangle Capital Partners II, L.P. (Quadrangle), and Warburg Pincus IX, LLC (Warburg Pincus) (intervenors), sought and received permission to intervene. After hearing oral argument, Judge Feinberg held the agreements in their entirety are not subject to disclosure under OPRA because they fall within one of the designated exemptions, and are not subject to disclosure under the common law right to access because defendants' interest in preventing disclosure outweighed plaintiffs' interest in disclosure.
On appeal, plaintiffs argue that the trial judge erred by narrowly construing OPRA and erred in her application of the provisions that exempt proprietary commercial or financial information, trade secrets, and/or information by which a competitor might obtain an unfair advantage. Plaintiffs also contend the trial judge should have found that the common law right of access to public documents allows production of the withheld documents. Finally, plaintiffs urge that the trial judge erred by holding that the documents in their entirety were exempt from disclosure.
In order to place the arguments in context, some information about the formation of the investments and the nature of the documents governing each investment is required. We derive the information from an affidavit submitted by the Director. We discern no dispute concerning the basic information outlined by the Director.
The Director invested pension funds in private equity funds by creating a series of limited partnership agreements with investment companies on behalf of Fund E. The limited partnership agreements created the private equity funds to which Fund E contributed money, designated the investment firms as general partners and managers of the private equity funds, and set parameters in which the investment firms would operate in investing fund money. Each partnership agreement is several hundred pages in length. Each agreement sets forth the name of the fund, its general partner and investment advisor, the general purpose of the fund, and the duration of the fund. According to the Director, the agreements
contain representations concerning the investment strategies and processes followed *1069 by the general partners [and] ... the parameters within which the general partners of the funds must operate.... They set limits on the types of investments that may be made, the amount of capital that may be invested in the aggregate or in a particular transaction, and the length of time during which capital may be invested.... [The agreements] restrict the outside activities of the general partners[,] ... limit the liability of the general partners and provide them with indemnification by the partnership for certain actions taken on behalf of the funds.
The agreements also set forth the rights of the limited partners. Although there are some differences among the various agreements, generally, limited partners have
the right to remove the general partner, to reduce or extend the term of the partnership or the investment period, and to participate on advisory committees that ... review certain decisions made by the general partner. The partnership agreements also provide mechanisms for limited partners to transfer their interests in the funds under certain conditions, to withdraw from the funds, to be excused from certain investments due to regulatory or other issues, or to co-invest with the fund in certain investments.
The partnership agreements also contain provisions about asset valuation, profit and loss allocation, computation of management fees, the manner in which committed capital may be called by the private equity fund, the manner in which financial information is reported to the limited partners, and the manner in which certain tax issues will be addressed. The agreements also contain default and dispute resolution provisions.
Fund E also entered into letter agreements or side letters with intervenors to address issues specific to the State. According to the Director,
[t]he letter agreements in some cases include provisions with respect to the State's right to a seat on the advisory board of the fund, provisions acknowledging the State's status as a tax-exempt entity, and additional notice or reporting requirements. The letter agreements also deal with certain legal restrictions applicable to the State, including limitations on indemnification and limitations on the contractual liability of the State due to its status as a sovereign entity. The letter agreements have provisions dealing with the [SIC]'s Policy Concerning Political Contributions and Prohibitions on Investment Management Business, and other applicable State laws and regulations.
The Director also reported that each agreement mandates confidentiality to the extent permitted by law. To that end, only four employees of the Division, in addition to the Director and Deputy Director and the Division's accountants and auditors, have access to the agreements. However, N.J.S.A. 52:18A-91(a) requires that the SIC "shall have access to all files and records of the division" and has "authority to inspect and audit the respective accounts and funds administered through the Division"; therefore, the Division provides copies of the investment agreements to any SIC member who requests them and agrees to keep the terms of the agreements confidential.[3]
*1070 The Director certified that it is standard practice in the financial industry to keep private equity fund agreements confidential. He reported that private equity fund managers informed him that they would not accept the State as a limited partner if the terms of the agreement were subject to public disclosure. He noted that some high-quality private equity funds provide more generous terms to public entities, such as the State, and are reluctant to have these terms disclosed to others. The Director opined that the inability to participate in private equity investments is not in the best interest of the State, and more particularly the state pension funds, because it forecloses an avenue to achieve greater returns.
Each intervenor also submitted certifications explaining the reason it insisted on confidentiality of the terms of the partnership agreements. The certification submitted by W. Bowman Cutter, Managing Director of Warburg Pincus, is illustrative of views of other private equity funds with which the SIC has invested funds. Cutter certified that Warburg Pincus's partnership agreement contained information on the following matters: investment structure, authority, and limitations; allocation of profits and losses, including provisions on liquidation; tax matters; obligations of the general partner; limits on the general partner's authority to create other funds or make other investments; the mechanism used to calculate distributions; fees and expenses; rights and restrictions on changes in personnel of the general partner; valuation procedures; and reporting obligations.
Cutter stated the fund developed those provisions "at considerable expense and through considerable negotiation with prospective limited partners." The terms of the agreements distinguish Warburg Pincus from other private equity funds and contained insight into Warburg Pincus's investment strategy. Disclosure of the information
would reveal to investment funds that compete with Warburg Pincus and ... that invest in the same markets as Warburg Pincus[,] proprietary and sensitive information, confidential methods, [and] business practices and strategies ... [which would] significantly diminish Warburg Pincus' competitive advantages in the market for private equity capital and would interfere with the ability of Warburg Pincus to carry out its investment strategy to the maximum advantage of its investors.
Cutter emphasized that "[t]he market for investment opportunities is highly competitive." In order to maximize its advantage, Warburg Pincus requires all of its limited partners "to agree in writing that they will not disclose the provisions of the Investment Agreements." Indeed, Warburg Pincus "will not accept investment by persons who will not agree to stringent confidentiality rules." Further, Warburg Pincus does not offer interests to the general public but contracts only with "individuals and entities that qualify as sophisticated investors under the federal securities laws." This exempts the investment agreements and the information contained within them from public disclosure under federal law. And the terms of the agreements are disclosed to Warburg Pincus employees, partners, agents, and attorneys only on a need-to-know basis.
Cutter certified that if the courts determine that the agreements are subject to *1071 disclosure, "there is a possibility that the opportunity to invest in similar private equity funds would not be made available to the State of New Jersey in the future by Warburg Pincus or other private equity firms generally."
Peter Ezersky, a Managing Principal with Quadrangle Group, opined that it would suffer "direct and substantial competitive harm" if the terms of its investment agreement with Fund E were made public. He emphasized disclosure of the capital structure of the Fund and a variety of information about the internal operation of the Fund could compromise the success of the investment. He also noted it "consistently and rigorously polices" compliance with the confidentiality provisions of its agreements.
Representatives of Blackstone and Oak Hill submitted similar certifications. Gregg Rubin, Associate General Counsel of Oak Hill, specifically addressed some of the problems that might impact the success of the Fund, if the terms of the agreement were subject to public disclosure. He explained:
when the General Partner desires to realize an investment (i.e., sell a portfolio company of Oak Hill), it negotiates the purchase price and terms with potential buyers. The value of each partner's interest in Oak Hill is directly linked to obtaining the highest purchase price. However, if the Investment Agreements were disclosed to the public, such potential buyers would have information that would undermine the General Partner's bargaining position. For example, if it were known that Oak Hill was reaching the end of its term and only had a short period of time to liquidate its holdings, such knowledge would impact the negotiation and the price potential buyers would offer for the portfolio company.
As of January 31, 2009, the State has invested $11 billion in the AIP, which includes investments in real estate, real asset funds, and hedge funds, in addition to private equity funds. The State has not disclosed how much has been invested in private equity funds.

II
Judge Feinberg found the documents sought by plaintiffs and withheld by the custodian of records are proprietary commercial or financial records. She also held that the documents may be considered trade secrets. Finally, she found that the withheld documents considered in their entirety contain information that would provide a competitive advantage to third parties at the expense of the State. Accordingly, the withheld documents are not government records and are not subject to disclosure.
Plaintiffs argue that the judge should have resorted to federal law, specifically the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552, to determine if the information excluded from review should be considered proprietary commercial or financial information or should be excluded as trade secrets or as documents that would confer a competitive advantage on another. They also contend the documents sought should be available for review under the common law right to access public documents. Finally, plaintiffs contend that the documents should have been disclosed in redacted form.
Defendants argue the judge properly excluded the documents from production and review in accordance with OPRA. They also contend plaintiffs have not articulated a sufficient reason for disclosure under the common law right to access public documents, particularly because representatives of their organizations sit on the SIC *1072 and have access to the documents. Finally, they emphasize that production of documents in redacted form would not further the purposes of either OPRA or the common law right due to the extent of the redactions.

A. Proprietary Commercial or Financial Information

Judge Feinberg found that the investment agreements constituted proprietary commercial or financial information because the certified statements submitted by Clark and intervenors provided, and the redacted versions of the investment agreements confirmed, that (1) intervenors had spent considerable time and money developing the terms of the agreements, (2) the agreements were the product of intervenors' years of experience, (3) the agreements were kept confidential by all parties and were not available to the public, (4) the terms of the agreements were disclosed to intervenors' employees and agents only on a need-to-know basis, and (5) disclosure of the agreements would give competitors an unfair advantage by revealing intervenors' structure, size, investment criteria, strategy and limitations, as well as the rights and obligations of the parties, the firm's compensation and internal governance matters. Thus, the judge held that the agreements were privately owned and related to business and investment and were therefore exempt from disclosure under OPRA.
OPRA allows the public access to all government records that are not exempt from public disclosure. N.J.S.A. 47:1A-1. OPRA's definition of "government record" is expansive. N.J.S.A. 47:1A-1.1. It includes
any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof, including subordinate boards thereof, or that has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof. The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.
[N.J.S.A. 47:1A-1.1.]
OPRA also contains twenty-one exclusions to the definition of "government record," including "proprietary commercial or financial information obtained from any source." N.J.S.A. 47:1A-1.1. Notably, if a document falls within one of these categories, it is not a government record and not subject to disclosure pursuant to OPRA. See Tractenberg v. Twp. of W. Orange, 416 N.J.Super. 354, 366, 4 A.3d 585 (App.Div. 2010) ("Under OPRA, all government records are subject to public access unless the records fall within at least one of its twenty-one exemptions."). Although we have not identified a decision in this State that defines or interprets this phrase in the OPRA context, we are not without guidance.
When we encounter a term in a statute that is not defined, we should assume the Legislature meant to "ascribe to the statutory words their ordinary meaning and significance...." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). If the ordinary meaning of a word or phrase reveals the legislative intent, we apply the plain meaning. Jablonowska v. *1073 Suther, 195 N.J. 91, 105, 948 A.2d 610 (2008).
Here, the American Heritage Dictionary of the English Language (4th ed. 2006), defines proprietary as
1. Of, relating to, or suggestive of a proprietor or to proprietors as a group: had proprietary rights; behaved with a proprietary air in his friend's house. 2. Exclusively owned; private: a proprietary hospital. 3. Owned by a private individual or corporation under a trademark or patent: a proprietary drug.

Commercial information relates to commerce or business. See American Heritage Dictionary. The plain meaning of financial information is information relating to the management of money, banking, investments, and credit. Moreover, the Supreme Court has had the occasion to explore the nature of proprietary commercial information in Lamorte Burns & Co. v. Walters, 167 N.J. 285, 299-301, 770 A.2d 1158 (2001).
In Lamorte, the Court confronted a claim that a former employee misappropriated confidential and proprietary information. Id. at 290, 770 A.2d 1158. The Court offered three factors to consider in evaluating a claim that information is commercial or proprietary information that should not be disclosed. The Court stated that the key elements are the relationship of the parties at the time of disclosure and the intended use of the information. Id. at 299, 770 A.2d 1158. The third factor is the expectations of the parties. Id. at 300, 770 A.2d 1158.
In Lamorte, the employer was in the business of investigating and adjusting claims for marine and non-marine liability insurers, their associations, and owners in this country and abroad. Id. at 291, 770 A.2d 1158. Lamorte hired the defendant to supervise an office, handle protection and indemnity claims (P & I claims), and solicit and establish new clients. Ibid. The defendant was an at-will employee but signed an employment agreement that contained a provision requiring him to "maintain in confidence all proprietary data and other confidential information...." Id. at 292, 770 A.2d 1158.
Six years later, the defendant began to consider the formation of a competing business. Ibid. When his employer announced its intention to de-emphasize the P & I claims work, the defendant formulated his business plan. Id. at 293, 770 A.2d 1158. He recruited another Lamorte employee to join him, incorporated his new business while still employed by Lamorte, and compiled a target list of clients derived from active files on which the two Lamorte employees worked. Ibid. The list included client names, addresses, phone numbers, file numbers, claim incident dates, claim contact information, and names of injured persons. Ibid.
A year later, the defendant and the recruited employee signed a lease for an office, purchased office equipment, and contemplated resigning just before Christmas. Id. at 294, 770 A.2d 1158. The defendant and the other employee cleaned out their offices, and faxed their respective resignations to the home office. Id. at 295, 770 A.2d 1158. The next day they sent solicitation letters and transfer authorization forms to thirty-three of Lamorte's thirty-four P & I clients. Ibid. The solicitation letter noted their fee structure "will be less than" the Lamorte fee structure for the upcoming year. Ibid. Within a day, ten Lamorte clients returned signed transfer authorization forms to the defendant. Id. at 296, 770 A.2d 1158. Within two weeks, all thirty-three Lamorte P & I clients transferred their business to the defendant. Ibid.
*1074 The Court noted that customer lists have long been afforded protection as trade secrets. Id. at 298, 770 A.2d 1158; see also AYR Composition, Inc. v. Rosenberg, 261 N.J.Super. 495, 504, 619 A.2d 592 (App.Div.1993). The Court emphasized, however, that business information may be protected, even if it does "not rise to the level of a trade secret...." Lamorte, supra, 167 N.J. at 299, 770 A.2d 1158. "The key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information." Ibid.
In Lamorte, the Court noted that the information purloined by the defendant "should be entitled to trade secret protection." Id. at 301, 770 A.2d 1158. It also held that "[t]he specific information provided to defendants by their employer, in the course of employment, and for the sole purpose of servicing plaintiff's customers, is legally protectible as confidential and proprietary information." Ibid. The Court emphasized that the information obtained and used by the defendant contained specific information concerning client claims that gave the defendant an unfair advantage in soliciting his former employer's clients. Ibid. Moreover, defendant knew his former employer wanted to keep this information confidential. Ibid.
Plaintiffs do not contest that the investment agreements are proprietary commercial or financial information. They argue, however, that Judge Feinberg adopted a constricted rather than an expansive view of the term, and urge that in the absence of state law interpreting the exclusion, the trial judge and this court should look to FOIA for guidance.
FOIA broadly defines a public record. It also provides that certain information is not subject to disclosure. Section 552(b)(4) of Title Five of the United States Code excludes disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." To qualify under this exclusion, information must be "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential...." Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 766 (D.C.Cir.1974). Information is confidential if disclosure of it "is likely to have either of the following effects (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Id. at 770 (footnote omitted).
Plaintiffs contend that under the federal test, defendants and intervenors only demonstrated that disclosure may impair defendants' future ability to invest in private equity funds, and that there is insufficient reason under federal case law to establish confidentiality. Judge Feinberg rejected this contention, as do we. Notably, OPRA does not require an independent demonstration of confidentiality. Rather, under OPRA, if the document contains commercial or proprietary information it is not considered a government record and not subject to disclosure. This difference between OPRA and FOIA is not simply semantics. It is a fundamental difference between the state and federal open public records statutory schemes and suggests to us that reference to federal law, and FOIA in particular, is of limited value.
We note, however, that the record before this court demonstrates that the Director and intervenors have proved that the documents sought by plaintiffs are indeed confidential. Each intervenor certified that disclosure of the documents would impair the ability of this State to participate in private equity funds, that the substance of the documents are available to its own employees only on a need-to-know *1075 basis, and disclosure of the nature and terms of specific investments would cause substantial harm to the competitive position of the fund. The fact that intervenors consider and treat the documents as confidential, even within their organization, is central to any confidentiality determination. Lamorte, supra, 167 N.J. at 301, 770 A.2d 1158; see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C.Cir.1992) ("[F]inancial or commercial information provided to the Government on a voluntary basis is `confidential' ... if it is of a kind that would customarily not be released to the public by the person from whom it was obtained."), cert. denied, 507 U.S. 984, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993).
The investment agreements sought by plaintiffs fall within the definition of proprietary information. Defendants' expectation of confidentiality is manifest. Each agreement contains extensive provisions on the need for confidentiality. Recognizing the need for some investors to report periodically on the investment, each agreement explicitly states what information may be disclosed. Each agreement also limits and expressly delineates those persons associated with the investor who may have additional information about the investment and on what terms.
Moreover, the information sought by plaintiffs is not the type of information intended for wide dissemination. The express purpose of the investment agreements sought by plaintiffs is to outline the rights, obligations, and responsibilities of the relationship between the general partner and limited partners. Each agreement contains specific information about the capitalization of the partnership, its commencement and termination date, and other information pertinent to the operational fortunes of the partnership. Finally, each agreement is a complex document. Each reflects years of experience and expertise by trained legal and financial professionals.

B. Trade Secrets

Judge Feinberg acknowledged that she did not have to address whether the investment agreements are exempt from disclosure as trade secrets. For the sake of completeness, she addressed the issue and held that the documents also qualify as trade secrets. We follow the same course; in doing so, we also hold the documents are not subject to disclosure.
OPRA does not define "trade secrets." We, therefore, rely on the principle of statutory construction governing technical terms, terms of art, and terms with existing legal meanings. That is:
In general, technical terms, terms of art, and terms with existing legal meanings, "[i]n the absence of legislative intent to the contrary, or other overriding evidence of a different meaning" are understood to have been used in accordance with those meanings. 2A Norman J. Singer, Sutherland Statutory Construction §§ 47:29, 47:30 (6th ed. 2000); N.J.S.A. 1:1-1 (declaring that "words having a special or accepted meaning in the law, shall be construed in accordance with [that] ... meaning.").
[In re Lead Paint Litigation, 191 N.J. 405, 430, 924 A.2d 484 (2007).]
In Hammock by Hammock v. Hoffmann-LaRoche, 142 N.J. 356, 662 A.2d 546 (1995), the Court explored the nature of a trade secret. It did so in the context of a pharmaceutical manufacturer products liability case in which a non-profit organization advocating safe and effective drugs sought access to documents filed with the court under a protective order. Id. at 361, 662 A.2d 546. This case is instructive because the Court approached the issue of access to the records starting with a presumption *1076 of public access to the documents, the same presumption adopted in OPRA. Id. at 375, 662 A.2d 546. Nevertheless, the Court held that documents containing trade secrets and confidential business information may be protected from disclosure. Id. at 376, 662 A.2d 546.
As to whether the specific information covered by the protective order qualified as a trade secret, the Court identified several tests for determining whether business information qualified as a trade secret. Id. at 383-84, 662 A.2d 546. It referred with approval to Comment b of the Restatement of Torts § 757 (1939), which provides, "[a] trade secret may consist of any ... compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," Hammock, supra, 142 N.J. at 384, 662 A.2d 546, and additional considerations identified in Smith v. BIC Corp., 869 F.2d 194, 200 (3d Cir.1989). Those considerations include the extent to which the information is known outside of the owner's business, the extent to which it is known by employees of the owner, the measures taken to guard the secrecy of the information, the value of the information to the owner and competitors, the effort expended to develop the information, and the ease or difficulty by which the information can be duplicated. Hammock, supra, 142 N.J. at 384, 662 A.2d 546.
In addition, the Restatement (Third), Unfair Competition § 39 defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford a potential economic advantage over others." A trade secret may also include pricing and marketing techniques. Trump's Castle Assocs. v. Tallone, 275 N.J.Super. 159, 162, 645 A.2d 1207 (App.Div.1994).
Applying these definitions and considerations to the record before this court, we hold that the investment agreements are trade secrets, as well as proprietary commercial financial information, and not subject to disclosure pursuant to OPRA. Only the general and limited partners and others on a need-to-know basis have access to the investment agreements. Each agreement contains a provision for sanctions for those who breach confidentiality. The agreements are not filed with a public agency or made available to the general public. Whereas private equity investments and the documents used to govern the relationship between the general partner and limited partner are used widely in the financial industry, no party, particularly plaintiffs, asserts that the contents of individual agreements are known beyond the partnership. In fact, this court has reviewed the unredacted agreements filed under seal with the trial court and can attest to the lack of uniformity among the several agreements.
The contents of the investment agreements are valuable not only to the general partners, but also to competitors. The agreements outline the organizational structure of the partnerships, investment strategies, investment limitations, and other terms governing the relationship between the general partner and limited partners. The effort and expense committed to develop the documents also weighs in favor of non-disclosure. As noted previously in this opinion, these are not simple documents. Each reflects years of experience by the general partners and the legal and other professional advisors employed by the general partners. In short, we hold these agreements should be treated as trade secrets. As such, they are not government records and not subject to disclosure pursuant to OPRA.

*1077 C. Competitive Advantage

Judge Feinberg also held that the documents contained information that would give an advantage to competitors. Therefore, N.J.S.A. 47:1A-1.1 provides these documents are not government records and not disclosable. We agree.
Judge Feinberg found that the partnership agreements and side agreements differ significantly from each other. She found:
Each is a unique blend of variables: the amount of debt each fund may carry, what fees the general partner takes from a fund's profits, the limits on the general partner's powers, how a withdrawing partner redeems their investment, how the fund distributes gains, and various other matters....
Moreover, the agreements detail a fund's limitations on buying and selling investments. Any competitor knowing when a fund's strategy would induce it to buy or sell would enjoy an advantage over the fund. Defendants point to a situation where, by reviewing a fund's partnership agreement, a competitor could learn when a fund would be liquidating an investment. As the time for liquidation neared, a competitor could gain an advantage by offering an artificially low price.
We have referred to these very findings previously in this opinion. Our review of these documents and the uncontroverted certifications submitted by each partnership readily demonstrate that disclosure of the full terms of the agreements would provide a competitive advantage not only to other private equity funds but also to other investors interested in the same sectors, companies, or properties.

III
Plaintiffs assert they have a right to access these documents pursuant to the common law right of access. We disagree because plaintiffs are not without means to acquire the necessary information to protect their legitimate interests, and the State's interest in confidentiality outweighs plaintiffs' interest in disclosure.
The common law right of access to public documents provides that a private party shall have access to public documents when the party seeking access has an interest in the documents and the party's interest outweighs the public's interest in preventing disclosure. Keddie v. Rutgers, 148 N.J. 36, 50, 689 A.2d 702 (1997).
Generally, the public's interest in nondisclosure is based on the need to keep the information confidential. Where a claim of confidentiality is asserted, the applicant's interest in disclosure is more closely scrutinized. In that context, courts consider whether the claim of confidentiality is "`premised upon a purpose which tends to advance or further a wholesome public interest or a legitimate private interest.'" Loigman v. Kimmelman, 102 N.J. 98, 112 [505 A.2d 958] (1986) (quoting City of St. Matthews v. Voice of St. Matthews, Inc., 519 S.W.2d 811, 815 (Ky.1974)). However, where the interest in confidentiality is "slight or non-existent," standing alone will be sufficient to require disclosure to advance a legitimate private interest. Id. at 105 [505 A.2d 958]; see also McClain [v. College Hosp.], supra, 99 N.J. [346] at 362 [492 A.2d 991 (1985)].
[Id. at 51, 689 A.2d 702.]
The following factors are relevant in determining whether the plaintiff's interest in accessing a document outweighs the defendant's interest in nondisclosure:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information *1078 to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
[Loigman, supra, 102 N.J. at 113, 505 A.2d 958.]
In this case, plaintiffs and defendants recognize that the agreements were common law public documents. Judge Feinberg held, and we agree, that plaintiffs had an interest in gaining access to them. The only issue was whether plaintiffs' interest in access to the documents outweighs defendants' and intervenors' interest in preventing disclosure.
Defendants and intervenors argued that if the agreements were subject to disclosure (1) the private equity firms will end their partnership agreements with the State, thus precluding the State from investing in private equity funds, which tend to yield higher rates of return than traditional investments, and (2) the State's bargaining power in negotiating partnership agreements in the future will be compromised, which will be inconsistent with the State's fiduciary duty to obtain the best bargain for state employees who have contributed to the pension system.
Plaintiffs argued that defendants' reasons for preventing disclosure were speculative because none of the certified statements submitted by Clark or intervenors definitively said that the State will be unable to invest in private equity funds if the agreements are disclosed to plaintiffs. Plaintiffs explained they have an obligation to their members to oversee the manner in which pension funds are invested and that they cannot honor that obligation if denied access to the agreements. Additionally, they argued that the public has a right to know how tax money is spent and the public cannot adequately oversee that spending if the agreements are kept secret.
The trial judge concluded that the investment agreements were not subject to disclosure under the common law because plaintiffs' interests did not outweigh defendants'. First, said the court, defendants' claim that disclosure of the agreements would effectively end the State's ability to invest in private equity funds was not speculative. Judge Feinberg cited three instances in which states had entered partnership agreements with private equity funds. After courts in the states ordered disclosure of the agreements, private equity funds refused to enter other partnerships with those states.[4] Second, plaintiffs' claim that they and the public could not carry out their duties to oversee pension-fund investments and tax spending, respectively, was undermined by statutes that required disclosure of certain information to plaintiffs and to the public.
On appeal, plaintiffs contend Judge Feinberg failed to recognize the extent of their interest in obtaining the investment agreements. They also argue that their interest in access outweighs defendants' *1079 and intervenors' interest in confidentiality. Defendants and intervenors respond that disclosure will harm the funds because their strategies will be available to competitors and Fund E's ability to invest in private equity funds in the future will be undermined.
We do not minimize plaintiffs' interest in the investment strategies adopted by defendants and vehicles selected to implement these strategies. Fund E is derived from public employee and public employer contributions to various pension funds. Plaintiffs, however, are not without tools to satisfy their interest and discharge their obligations to their members. The SIC is comprised of thirteen members, two of whom are CWA and NJEA nominees. N.J.S.A. 52:18A-83(a)(4) and (5). The SIC receives information regarding the material terms of the agreements, including the name and type of the fund, the size and geographic focus of the fund, a general description of the fund's investment strategy, the term of the fund and the investment period, the amount of the State's commitment, and the management fee paid to the fund. The fund's strategy includes the industry and geographic focus of the fund. Notably, the CWA and NJEA representatives may receive access to an entire agreement, if plaintiffs' representatives execute confidentiality agreements. In other words, the non-public disclosure of the documents cannot and does not hamper the discharge of plaintiffs' representatives' fiduciary duties to their respective members. It is no answer to stress the complexity of the agreements. It is incumbent on plaintiffs to nominate and elect only those members who can discharge the weighty responsibility of membership on the SIC.
We also note that the SIC provides information on a periodic basis on the work of the Division. This report includes disclosure of its investments and investment strategies, and includes information on the private equity fund investments. Moreover, our in camera review of the agreements reveals that each agreement recognizes the need for public disclosure in summary form and does not preclude such disclosure.
In some respects, this effort to obtain access to documents shielded from disclosure by OPRA is similar to Wilson v. Brown, 404 N.J.Super. 557, 563-64, 962 A.2d 1122 (App.Div.), certif. denied, 198 N.J. 473, 968 A.2d 1189 (2009). There, the Governor and a senior union official acknowledged they engaged in communications during the collective negotiations period, that each had been counseled against engaging in such discussions, that some of these communications included discussion of issues other than issues subject to negotiation but other communications included discussion of matters subject to negotiation. Id. at 580-81, 962 A.2d 1122. We noted the public had received all the relevant information it required to evaluate the actions of the Governor, and disclosure of the text of the communications offered no additional benefit. Id. at 581, 962 A.2d 1122. Here, the information already available to plaintiffs allows them to monitor the progress and wisdom of Fund E's investment in private equity funds. If plaintiffs' representatives believe they need further information to discharge their fiduciary obligations to the SIC and to the members of their respective unions, they may obtain access to the agreements in their entirety.
We do not minimize that investments in private equity funds are controversial. We have previously held such investments are authorized by statute as long as the investment is consistent with the statutory prudent investor standard of care, N.J.S.A. 3B:20-11.3. Commc'ns Workers of *1080 Am., supra, slip op. at 36. Such investments are controversial for several reasons, including the degree of risk associated with such investments and a concern that pension funds may be entrusted to a favored group rather than a general partner best suited to advance the investment goals of the various state pension funds. However, whether the SIC should invest pension funds in private equity funds, or whether the SIC should invest more or less in such funds, or whether the SIC should invest in some but not other funds is not the subject of this legal dispute or this opinion. The issue is whether plaintiffs have demonstrated an interest in obtaining disclosure of the agreements that outweighs the interests of defendants and intervenors to maintain their confidentiality. We hold, as did Judge Feinberg, that plaintiffs' acknowledged interest, although weighty, coupled with the extent of the information they have and their ability to obtain more, does not outweigh the interest in non-disclosure demanded by the funds and accepted by defendants.

IV
Finally, plaintiffs argue that the confidential elements of the agreements should have been redacted and the balance of the agreements released to them and the public for inspection. They urge that Judge Feinberg's oral opinion did not adequately explain her decision to deny access to the entire agreements. We disagree.
As discussed, OPRA articulates a broad and firm public policy that government records are available for inspection. N.J.S.A. 47:1A-5(a). OPRA then lists numerous categories of documents that do not fall within the definition of government record, portions of documents that disclose social security numbers, credit card numbers, unlisted telephone numbers, or driver license numbers, and six categories of documents maintained by public institutions of higher education. N.J.S.A. 47:1A-1.1. In other words, if a document falls within one or more of these enumerated categories, it is not a government record and not subject to disclosure. See Tractenberg, supra, 416 N.J.Super. at 366, 4 A.3d 585.
OPRA also recognizes that a part of a document may contain information that is exempt from public disclosure. In such instances, the custodian must "delete or excise from a copy of the record that portion which the custodian asserts is exempt from access and shall promptly permit access to the remainder of the record." N.J.S.A. 47:1A-5(g). A similar rule applies under the common law. N. Jersey Media Grp. Inc. v. State Dep't of Pers., 389 N.J.Super. 527, 539, 913 A.2d 853 (Law Div.2006).
We have previously discussed the nature of the investment agreements in our discussion of whether they can be considered proprietary or commercial financial information, or trade secrets, or documents that may confer an unfair competitive advantage on others or to the State. We have previously referred to our in camera inspection of the documents, as supplemented by the certifications submitted by defendants and intervenors.[5] This inspection confirms Judge Feinberg's *1081 assessment of these documents as not susceptible to redaction.
To be sure, each investment agreement is many pages in length. Yet no two agreements are identical, even in the material many would describe as boilerplate. For example, each agreement contains a definition section, yet no two agreements contain a common set of definitions and some agreements define the same terms differently. Each agreement has a section describing governance but no agreement contains the same provisions.
As previously noted, each agreement reflects years of experience by financial and legal professionals. The application of this expertise to a given set of documents is entitled to protection. Moreover, information that may undermine the competitive position of individual funds is distributed throughout each agreement. In other words, sensitive information is not collected in a single article in any agreement.[6]
Plaintiffs criticize the lack of specificity in Judge Feinberg's discussions of the redaction issue. Including specific references to the sealed documents inspected in camera is fraught with difficulty. We, too, have struggled to fashion an adequate explanation to preclude accidental disclosure of confidential information. We are satisfied, however, that the nature of these agreements, permeated as they are with information about not only the targeted investment or industry or sector but also the industry, sector, or geographic area in which it will or will not invest and the limits of any such investment, and the manner in which the partnership shall be governed warrants holding that the agreements in their entirety are not government records and not subject to disclosure.
Affirmed.
NOTES
[1] The complaint named John E. McCormac, Treasurer of the State of New Jersey, as defendant. Pursuant to Rule 4:34-4, his successor in office has been substituted in the caption.
[2] The SIC is governed by N.J.S.A. 52:18A-91.
[3] Prior to making any binding commitment of $50 million or more, the SIC Investment Committee and the Director provide the entire membership of the SIC with information concerning the manner in which the fund was selected, its name and purpose, its general investment strategy, its term, the management fee, the size of the general partner's investment in the fund, and the return on investment to limited partners before the general partner can share in the profits of the fund. This information is also available to the public.
[4] In each instance, the state legislatures responded by amending the state right-to-know statute to provide confidentiality to these agreements.
[5] Although our review of any factual findings is not de novo, we believe it is incumbent on an appellate panel to review the same documents reviewed by the trial judge, particularly in an area as sensitive as public access to government records, assuming plaintiffs have satisfied the required showing. See Wilson, supra, 404 N.J.Super. at 574, 962 A.2d 1122 (when a privilege is invoked by the custodian of public records, such as executive privilege, the court conducts an in camera review of the documents only when the party seeking the documents demonstrates an adequate need).
[6] Disclosure may also allow others without sufficient experience in the financial industry and without sufficient expertise in securities laws and/or heavily regulated industries, such as banking, insurance, and communications to appropriate these agreements, "cut and paste," and generate documents that may not be adequate for other investment vehicles or investors.